## Case No. 6,916.

### The HUNTSVILLE.[1]

District Court, E. D. South Carolina. Nov., 1860.

SALVAGE—PUBLIC SERVANTS — ADMIRALTY JURISDICTION—NECESSITY FOR SALVAGE —UNSUCCESSFUL EFFORTS.

[1. Public servants may recover salvage for assistance of great merit, rendered in the line of their regular duty, but in excess of the official requirements thereof.]

1 [Not previously reported.]

[2. A city fire department may recover salvage for saving a burning ship, brought by permission of the city authorities within the city jurisdiction.]

[Cited in The Cherokee, 31 Fed. 170.]

[3. The mayor of Charleston has power to forbid the coming of a burning ship from sea to the city wharves; also to make her coming conditional upon her paying all the expense of saving her.]

4. The admiralty jurisdiction extends to a salvage suit by a city fire department for services rendered from the land to a burning vessel brought to the city's wharves.]

[5. The admiralty jurisdiction extends to a salvage suit for services rendered from the land in completion of services rendered by other salvors at sea.]

[6. The federal jurisdiction in admiralty in South Carolina extends to all cases whereof the state admiralty courts, by statute or otherwise, had jurisdiction before the federal constitution was adopted.]

[7. A contract for compensation at all events is no bar to salvage unless it is express, explicit, and clearly proved.]

[Cited in Bowers v. The European, 44 Fed. 488.]

[8. Unsuccessful efforts to save imperiled property are not grounds for an award of salvage.]

[9. A tug which gets a burning vessel afloat, and tows her to a place where other parties put out the fire, renders salvage service, although both sets of salvors deny co-operation.]

[10. A vessel which, by a signal of distress, secures the aid of salvors, will not be heard to say that she could have saved herself without assistance.]

[11. The fact that salvage services were rendered by a steam vessel to a steam vessel is a ground for larger compensation than if both had been sailing vessels.]

[This was a libel for salvage by Ross C. Davis and others, owners of the steamer Nina, and by the Phoenix Fire Engine Company and others, against the steamship Huntsville and cargo.]

MAGRATH, District Judge. The steamship Huntsville in her voyage from Savannah to New York, off Cape Romain, was discovered to be on fire. Her captain determined to make for the nearest port, and her course was changed for Charleston. Signals of distress were set, and the Patapsco, a steamship owned by the same company, was signalled. The steamship followed her to afford such assistance as she could. Between Cape Romain and Bulls the Huntsville took a pilot. The female passengers left her, and, in the pilot boat, were brought to the city of Charleston. Under the charge of the pilot boat, the Huntsville was brought through Maffit's channel, and when she reached the inner buoy, went ashore. It was ebb tide; and under ordinary circumstances it would not have been attempted by the pilot to bring her in at that state of the tide. Her condition, however, was calculated to excite alarm, the smoke then issuing from her, and the pilot advised the captain, and he concurred in the advice, to

make the attempt, and trust to the chance of relief by a steamer. Her signal of distress, which had been kept flying from the time her course had been changed, attracted the attention of the revenue cutter William Aiken, Capt. Coste, who sent an officer on board of her, and, having ascertained the cause of her distress, relieved her by taking her passengers, their baggage, and that of the crew, the nautical instruments, and some of the furniture of the steamship, and bringing them and it to the city of Charleston. The libellants Ross C. Davis and others, owners of the steamer Nina, having been released from another engagement, previously made, to tow a vessel to sea, proceeded also to render assistance. Hereafter it will be necessary to examine particularly the evidence which relates to the extent of the service rendered by the Nina. The Huntsville at length floated, and was got off. By the Nina she was towed to Southern wharf in the city of Charleston. Before, however, the Huntsville reached the wharf, certain occurrences had taken place, which principally affect the second libellants. Mr. Caldwell, the consignee of the Huntsville, made an application to the mayor of the city for permission to bring the vessel to one of the wharves. The chief of the fire department had also inquired of the mayor what was his purpose in relation to the vessel. That gentleman considering it unsafe, informed both parties of his intention not to suffer the steamship to come to the city. Upon a second and more urgent application being made to him, he went to the wharf to determine how far he would be justified in recalling the refusal he had given. The location of the Southern wharf, the quarter from which the wind was blowing, the report of an officer whom he had sent to ascertain if there was a probability of the fire being subdued if the steamship was allowed to come to the wharf, the large amount of property at risk, and the understanding that the steamship would be put under the charge of the fire department, and no expense of any kind be incurred by the city, induced him to give his assent to the admission of the steamship to the wharf. She was brought to the wharf. The fire department took charge of her, and subdued the fire.

The first of many questions raised in the case, which I propose to consider, is that which involves the right of the second libellants to maintain in this court, a claim for salvage. If the denial of the right to salvage be the legal consequence of the propositions from which in the argument it was deduced, it cannot be maintained, for these propositions are in themselves undeniably true. The obligation to afford succor to those who may be in distress is incorporated with every code of laws which obtain respect and command obedience in civilized societies. To aid those who may be unfortunate is alike the duty of nations and individuals,

and its obligation is postponed only in cases where it would be productive of injury to those who otherwise are bound to its performance. And this duty is in many cases made more specific in its obligation by being incorporated in the stipulation of treaties by which the claim of those who need succor becomes changed from an imperfect obligation, as it affects others, into a perfect right which may be enforced, and in aid of which the authority of government may be invoked.

The treaties which have been made by the United States with France, Spain, Portugal, and perhaps other nations, all contain provisions which operate to secure by force of positive municipal law, that protection and succor for the unfortunate which the moral law and the law of nations have declared to be proper. At an early period protection was much needed and aid much required in cases of disaster at sea, or of wrecks on the coasts of seas. Piracies and sea robberies are said to have preceded any regular state of commerce, and cruelties on the coasts, in cases of wrecks were the retaliations practiced for the injuries suffered from those who controlled the seas. The right to wrecks, to whomsoever it belonged, whether claimed by the crown or those who held under its grant, was in its enjoyment distinguished by enormities which provoked the reproach that in some places wrecks were considered blessings proper to be prayed for. In the civil law we find the censure justly due to the inhumanity which prevailed in relation to such practices in the refusal of the Roman emperor to enrich his treasury by the calamities of others, and the experience of an English monarch of the suffering which shipwreck entailed upon those who experienced the misfortune is said to have been the occasion at that time of those provisions in the laws of Oleron which recognized the right of those who in such cases had occasion for protection. Moll. De J. Mar. 265. But this protection from that forfeiture which resulted from misfortune, whether it enured to the benefit of the ruler or of those who, without regard to law, enriched themselves at the expense of suffering to others, has never been confounded with the right to salvage,—a right which, conceding to the unfortunate the restoration of that which would have been lost without the assistance of others, and which regards that assistance as suggested by the highest considerations of humanity, yet enforces upon those who have been restored to their property, a proper regard for the services of those who have thus saved for them that which otherwise would have been lost. Martens, Law Nat. 167. And this principle, with the increase of commerce, and the necessity for its application in all cases, has lost such of its attributes as may have existed in connection with individual cases, and is regarded now only in the light of a general law resting upon the broad basis of public policy and of the most comprehensive application. Resting, however, as it did, upon the obligation of individuals to afford succor to the distressed, and suggested, as it is presumed to have been, by higher considerations than the mere desire for gain, that obligation which is now imposed upon those who are saved to those who save is divested of all considerations which apply to the case of a mere contract. And so necessary is it to keep this service strongly and distinctly marked by the considerations which have been applied to it, and so essential is it to the necessities of commerce, that even allegations of improper motives inducing the efforts in salvage cases as valid objections to compensation, if deserved, will not be heeded, unless they have been subsequently carried into practice to the injury of those whose property has been saved. Le Tigre [Case No. 8,281]. It is not, then, because of an indifference to the suffering of others, or a disregard of the obligations of humanity that compensation for salvage service is allowed, but because on the part of the salvor an obligation is recognized to afford aid, and at the same time an obligation is recognized and enforced upon those who have been saved to be mindful of that aid by which they have been relieved.

In France the "Ordonnance de la Marine" in the time of Louis XIV. abolished what was called the "right of wreck," which had existed up to that time, and the provisions of that celebrated code are still preserved. It places the shipwrecked mariner and his goods under the protection of the state, and punishes with death whoever shall rob them. But, upon the principles before referred to, salvage is allowed in all such cases. In Great Britain, under the statutes passed in the reigns of Queen Anne and George II., and various other statutes, minute and wholesome regulations are provided for the protection of persons and property wrecked or stranded, and in such cases provision is also made for the payment of salvage to those by whose efforts such property has been saved. In the United States, by the act of congress 22d December, 1837 [5 Stat. 208], the president of the United States is authorized to cause a suitable number of public vessels to cruise upon the coast in the severe portion of the season to afford aid to distressed navigators. No special provision has been made for salvage, in such cases, but it has been held that such services may, under certain circumstances, entitle the party to salvage compensation. In the case of The Josephine [Case No. 7,546], Judge Nelson, referring to the question, whether the crew of a public vessel of the United States affording relief to a private vessel of the United States according to the instructions of the government could be entitled to salvage, said: "I have no doubt that cases may exist in which they are entitled to salvage compensation, both on prin-

ple and authority. But in such cases something more than the usual peril should be encountered by the officers and crew, and an extraordinary service should be rendered, exceeding the duty imposed upon them by their employment in the public service, and the special instructions of the government upon the subject. * * * Great and extraordinary service and peril in rescuing a vessel and cargo would present a different question, and stand upon different principles and policy. Such acts should of themselves be the subject of reward and encouragement." And this rule is founded, as is the whole doctrine involved in the law of salvage, upon the effect it produces in stimulating individuals to the exercise of that conduct by which the essential interests of humanity are subserved. In alluding to the heavy compensation which rewards services rendered at sea over those which are offered on land, Chief Justice Marshall places the motives of legislators and courts "in a liberal and enlarged policy." The allowance of a very large compensation for those services is intended as an inducement to render them, which it is for the public interests and for the general interests of humanity to hold forth to those who navigate the ocean. Mason v. The Blaireau 2 Cranch. [6 U. S.] 240. And the evidence of a common consent in holding out such rewards is not inconsistent with, but efficient means in developing, the general interests of humanity, as is seen in the continued recognition of this liberal and enlarged policy. With the first efforts which were made to protect those who in person or property suffered from the calamity of shipwreck reasonable compensation in return for the aid which had been given to the suffering was constantly declared. In 27 Edw. III. c. 13, goods saved were charged with a reward called "salvage"; and so in 12 Anne Stat. 2, c. 18, 4 Geo. I. c. 12, and other statutes passed by the British parliaments in relation to this matter. Nor is it in those times only, in their statutes or judgments of courts, that the same principle may be found. In the treaty between Great Britain and Sweden in 1661, between Great Britain and Denmark about the same time, between Great Britain and France in 1713, "a proper premium," "a reasonable reward," and "salvage" indicate the right to compensation established by law given to those who discharged the duties of humanity provided for by the state, and their enjoyment of that right was held consistent with the high purposes which led to its recognition. 2 Laws of the Admiralty, pp. 5, 20. And this consistency of a right to compensation with the discharge of duties involved in regard to humanity is distinctly recognized by the supreme court in U. S. v. The Amistad, 15 Pet. [40 U. S.] 518. The property captured was owned by Spanish subjects, and when taken by the officers of the United States was under the control of negroes, who had risen in mutiny, murdered the captain, and were in quest of a land where they could regain their freedom. The treaty with Spain of 1795 provided that all ships and merchandize rescued out of the hands of pirates or robbers on the high seas shall be brought into some port of either state, and be delivered to the custody of the officers of that port, in order to be taken care of and restored entire to the true proprietor. But the supreme court allowed salvage in the case to the officers and crew of the public vessel of the United States by whom the capture had been made, and held it to be a highly meritorious and useful service, to the proprietors of the ship, and cargo, and such as by the general principles of maritime law, is always deemed a just foundation for salvage.

If fuller illustrations were wanting, they would be found in the precautions adopted by the government of the United States for the protection of those who suffer the perils of shipwreck. The wrecking system on the coast of Florida is essentially connected with a discharge by the government of the United States of its obligations in this respect, and is distinguished by the care with which the discharge of the duty is regarded. The considerations of humanity which prompt the regulations thus made and provide in the discretion of an enlightened judge the control of the reward which shall stimulate the efforts necessary in such cases is but a proof of the consistency which public policy recognizes and establishes between the discharge of this high duty to humanity and the recompense given to those by whose aid that duty is most effectually discharged. From these early periods, when the attention of rulers and lawgivers was excited by the suffering of those who exchanged the horrors of shipwreck for the miseries which befell them on shore, and ample provision was made for protecting persons and property from the rapacity of those who were accustomed to plunder and kill, down to the present time, we find the constant evidence that these duties of assistance and protection devolved upon the subject were reconciled and held consistent with a proper compensation to be given in all cases where the conduct of those who had given aid were deserving of it. Nor can there be any hesitancy in adhering to what must be considered a settled rule of public policy in this respect. And while we hold the obligation, whether considered in relation to nations or individuals, to afford succor to the distressed as of the highest kind, we are forced to regard the compensation given to those by whom that succor was afforded as sanctioned by the same law which prescribes the obligation, and resting for its support upon the same considerations of public policy which make the service rewarded by it a duty to be observed by those upon whom it is enjoined.

The next objection made to the second libellants is that they were in the discharge of a prescribed legal duty, for the performance of

which there is a prescribed legal provision for its discharge, and this, it is alleged, prevents them from making the claim now set up in this court. Such unquestionably would be the consequence resulting from the proposition were it applicable to this case. But the evidence in this case furnishes many circumstances which materially tend to qualify its applicability. And if it were so that it had in this case a direct application, there are also cases of recognized exceptions, which are as positive as the rule itself. The law laid down by Judge Nelson in the case of The Josephine is plain and positive. Although there may be a specific legal duty to the performance of which there is annexed a specific legal compensation, great and extraordinary service and peril place him by whom it is performed or experienced upon a higher position, and are of themselves proper subjects for reward and encouragement. So in the case of Le Tigre [Case No. 8,281], Judge Washington says: If an officer, acting as such, exceeds the limit of his official duty by giving extraordinary assistance to save property, he is entitled to salvage. If this fire had occurred when the Huntsville was lying in one of the docks of the city; if she had been brought to the city by the authority of the mayor, without the addition of any other circumstances,—the law in such cases created for the fire department a plain, positive duty for the performance of which they were legally bound, and upon the performance of which they became entitled to certain compensation from the city of Charleston. But this fire did not occur within the limits of the city of Charleston, and, while outside the limits of this city, no legal duty existed by which the services of the fire department could be demanded. And although the Huntsville was subsequently brought within the limits of the city of Charleston, yet it was under such circumstances as, while they served to impose upon the fire department the duty of assisting to save her, at the same time changed the source of that duty from the laws which governed their organization as part of the police of the city of Charleston to other laws which would have been and were alike applicable to any who, having the same means of saving under their control, were not previously subject to the control of the city, nor governed by laws enacted for the regulation of the fire department.

When the Huntsville reached the city, it was because the mayor of the city had signified his assent to the application made to him for that purpose. He had signified that assent, among other considerations, upon the express condition that the fire department would take under their charge the burning vessel, protect from the danger of conflagration the adjacent property in the city, and surrender all claim to compensation from the city for the services they might render. Excluding for the present other agencies, which were employed in the saving of the Hunts-

ville, the fire department may really be regarded as having obtained permission of the mayor, at their risk to introduce this vessel within the limits of the city in order that she might thus be brought within the reach of those agencies which they possessed, and which they could only use efficiently within those limits, and by the use of which they could contribute to her safety. Exclude the Nina from her connection, and suppose the case of the fire department, under all the circumstances as they appear by the evidence, having chartered a steamer to tow the Huntsville, while on fire, in the harbor of Charleston, to one of these wharves, in order that they might, by the use of their engines and other applications, save her from conflagration, and can there be a doubt that this would be a salvage service? And if it were—which it is not—that they became remitted to their specific legal duties, are not the circumstances connected with her introduction here and safety extraordinary enough to entitle them to salvage even if, as is urged, performing but legal duties, they were entitled to receive also their legal compensation? In the case of Le Tigre the collector had regularly seized a vessel, and by that unlawful seizure she was saved for the owner. Yet Judge Washington considered that sufficient, resulting as it did, in saving the vessel for the owner, to award him compensation for the service.

I have said that the fire department did not, because of the introduction of that vessel under the circumstances of the case, become remitted to their specific legal duties. If they did, they must at the same time have become entitled to specific legal compensation which results from their discharge of those duties. But can it be supposed that their claim could have been maintained against the city, when they had relinquished it, and that relinquishment was one of the motives which induced the mayor to permit the introduction of the Huntsville within the limits of the city? There was, for all the purposes of that occasion, by mutual consent, a suspension of the relations which existed between the fire department and the city. There services, intended for the protection of the citizens of Charleston, were enlisted in behalf of a stranger, and the city of Charleston became of necessity only the place in which those services could be employed. Unconnected as they were for that purpose with the city of Charleston, not called to the discharge of their legal duty by the mayor, but permitted to employ themselves elsewhere; not entitled to compensation from the city, because their services were not to be employed for the benefit of the city,—they are here, for all legal purposes, making their claim in the same manner as if it had been practicable for them to have carried their engines to the place at which the Huntsville was ashore, and then had extinguished the fire. But it is said the mayor was not justified in withholding his permission to bring

the Huntsville within the city of Charleston, and that when he did assent he was not justified in making the exoneration of the city from all claim for compensation a condition annexed to his permission. The first proposition cannot be maintained in law, the second proceeds to a great extent from a great misapprehension of the fact. Such an exercise of power as that referred to, and by which that vessel might have been refused admission to the city, is connected with the preservation and welfare of that community over which the mayor is chosen ruler. It is involved in the general power which is vested in the corporation of the city of Charleston, a municipal corporation, to be regarded as the agent of the legislature for the purposes of government,—White v. City Council of Charleston, 2 Hill (S. C.) 571,—the existence and exercise of which is necessary for the safety of the city, and does not necessarily require an express grant to give it existence or authorize its exercise, because it is an element indispensable in every organized community, and essential to its welfare, to control the admission or introduction of persons or things by which its welfare will be endangered. Nor does it militate with the proper exercise of this authority that it may be indiscreetly, or even improperly, exercised. Such cases would seem to show that an officer was unfit, not that his authority was unwise. And such cases might prove the abuse of the power without presenting an argument against its use. The correction, too, would be found in those proceedings which relieve a particular evil without affecting the basis of self protection upon which every community reposes. Id.

In this particular case it does not appear upon what ground that discretion with the exercise of which the mayor, a representative of the corporation, is clothed, can be challenged. That the danger of fire communicating itself is great, and to prevent it arbitrary measures in the exercise of an honest discretion may be adopted, is seen in the power to destroy private property without the owner having a right to compensation. White v. City Council of Charleston. That this danger is equally great, in its application to shipping is seen in the power which is given to take a burning vessel from her place at the wharf and tow her into the harbor, where the work of destruction may be consummated. Such power is plainly given. But how much greater is this power than that which is exercised in preventing a burning vessel from coming within the limits of the city? In the one case, because of an apprehended danger, a vessel is not allowed to come within the limits of the city; in the other, a vessel within the limits of the city, contributing its quota to the treasury, and receiving therefor a right to all the protection which the city can afford, is deprived of that protection because it cannot be given without danger to the community. If the

power in the latter case is admitted to exist, it is not easy to be perceived how it can be denied in the former. And when the power to refuse admission to the limits of the city to a vessel like this is questioned or denied it must be either because of some obligation resting upon the city to admit her, or some right of that vessel to be admitted.

There is an obligation on the city to admit; there is a right in the vessel to be admitted; but the obligation is complete when no injury thereby accrues to the city, and the right is perfect when its enjoyment does not produce injury to the party in regard to whom it is exercised. The law which in a nation, state, or municipality is necessarily most commanding is that which protects its security and maintains its welfare. And no right can be claimed or enjoyed by any one, not even by a member of that nation, state, or municipality, except as subordinate to this great law. And if its own welfare may properly influence a nation, state, or municipality in admitting within its limits that from which it apprehends mischief to itself, who shall determine the existence of the cause of danger or the sufficiency of the apprehension? The law of nations, the local laws of organized communities, and the necessities which give rise to the power of refusal, all unite in placing the power where it only can be placed to accomplish the purpose for which it is intended,—with the community to which admission is sought. And to one or more persons, where, in its exercise, discretion is involved, does each community confide the administration of such authority as may be necessary for the exercise of this power. And this power, so arising, and so to be exercised, must be, at least in cases of emergency, final in its exercise. To it we must apply the maxim, "Stat pro ratione voluntas." A review of its propriety, so far as it applies to a particular case, cannot be given to the community, far less to the stranger affected by it. No one will contend that the community would have a right to overrule the discretion of the mayor refusing permission for the Huntsville to come to the city. No one will contend that the Huntsville would have a right to disregard that refusal, and force her way into the docks of the city. And if she could not, and if, because of such refusal no claim for indemnification could be brought against the mayor or against the city, his discretion, when exercised, and his determination, when expressed, fixed the legal relation of all parties to that vessel. He refused her the protection of the city, and, if not entitled to that protection, there existed no legal duty of the fire department towards her. Their services thenceforth were wholly voluntary. Nor can they be considered otherwise, unless in these proceedings it is assumed that the conduct of the mayor is to be investigated for the purpose of substituting at this time new relations between these parties for such as existed at the time when

the services were rendered, and to which, as they then existed, the Huntsville became bound by submitting to the conditions upon which was rested the permission of which she availed herself.

It is also urged that the permission, when granted, could not be clogged with conditions; that, if her admission to the city was consistent with its safety, there could be no just ground for refusing her permission to come in; and, above all, that the permission could not be withheld unless upon the condition of an exoneration from expense. If it had been so that the permission to enter the city was withheld upon no other ground than that it would subject the city to a large expenditure of money, and if it was therefore made a condition of that permission that this expense should be saved the city, I cannot see in the condition any thing at war with the principle by which it is urged that considerations of humanity gave to the vessel a right to that permission. The claim which that vessel did present was to be allowed the opportunity of being saved, not that the city of Charleston should pay the expense of saving her. It was not the aid of the city treasury she needed; and, if she did need it, the argument derived from considerations of humanity has no application. But it was not because of the expense to the city that might be involved in her admission to the city that the mayor refused his permission. It might very well seem to that officer, somewhat inconsistent, that he whose duty it was to cause a burning vessel in the dock of the city to be towed out should order a burning vessel to be towed in. But it was because of his apprehension of danger to the city that he refused. Nor was his assent given until he had visited the wharf, examined the property which would be exposed, obtained the opinions of the fire department, weighed the urgent representations of the consignee, as to the value of the property in peril, and obtained from a special messenger a report of the probable danger of the flames bursting forth before the fire department could take possession of her. When these things were ascertained, it was proper for him to enquire whether, in addition thereto. the city should be subject to the expenses of the fire department. Had the Huntsville been moored without some such understanding as did take place, then would a fixed legal duty have been devolved upon the fire department, and a fixed legal liability for their compensation would have arisen by the city of Charleston. Nor, under such circumstances, would there have been a legal liability on the Huntsville to reimburse the city of Charleston for its expenditures. But the expenditure of the money of the city was not needed, was not desired by the Huntsville; it only asked the privilege of being admitted to a place at which it might be saved from the fire which threatened her destruction, by all such agencies as she could command. I

have no doubt that the mayor had perfect authority to protect the city, by refusing admission to the Huntsville; or, if he admitted her, to protect the city against the expenses which were involved in that admission.

It is next objected that the service performed by the fire department was not in its nature maritime. that it cannot be considered salvage, and therefore is not within the jurisdiction of this court. In that view which I shall hereafter more particularly explain of the services rendered in the case, the objection now made will not be as applicable as it would be under such circumstances as were assumed in the argument as developed by the evidence. I shall at another stage of this case deem it necessary to show that the service rendered in this case was either a joint salvage or that salvage service cannot be claimed by the first libellants unless its completion, without which it cannot be claimed by the first libellants, is directly connected with the services rendered by the fire department. It may be that the fire department could, under certain circumstances, be considered salvors and the first libellants be not so considered, or at least as salvors not entitled to high reward. But in no event could the first salvors be entitled to claim as such unless the fire department be also regarded as joint salvors with them, or the saving accomplished by that department be regarded as the completion of the work commenced by the first libellants. That the service was rendered from the land to a vessel within the admiralty and maritime jurisdiction of the courts of the United States is not sufficient to deprive it of the character of salvage, if the other circumstances necessary to be found in such cases also exist. The Centurion [Case No. 2,554]. If the service has been rendered on the land to goods which are on the land, but which have been saved or brought from the sea, it would undoubtedly be a case of salvage. In cases called "mixed," where the service partly on the tide water and partly on the shore, jurisdiction of such as cases of salvage has been affirmed by the supreme court. U. S. v. Coombs, 12 Pet. [37 U. S.] 72; American Ins. Co. v. 356 Bales of Cotton, 1 Pet. [26 U. S.] 511. That where the service has been performed wholly on the shore, in relation to goods cast ashore from a wreck, it will be regarded as a salvage service, and of it this court will entertain jurisdiction, was held in the case of Stevens v. The Argus [Case No. 13,366]. And that such services are not merely constructive salvage service, but so declared by positive legislative enactment, is seen in the law of the state of South Carolina passed March 16, 1783. The grant of admiralty and maritime jurisdiction in the constitution has been held as exclusive (Const. U. S. art. 3, § 2; Act. Cong. Sept. 24, 1789, c. 20, § 9 [1 Stat. 76]), and, being so, would include among all other subjects of and incidents to that jurisdiction, whatever had

been in the several states or by either of them declared to be within its cognizance. It could only be by thus embracing all things subject to this jurisdiction that one of the chief purposes in making the grant of it exclusive, so that uniformity in the exercise of it could be secured, would be accomplished. If included in the grant of maritime and admiralty jurisdiction, it is a distinct element in that grant to be administered by the courts of the United States for the benefit of the state by which it has been granted. If not included in the grant, it is still a subject of jurisdiction in the state, and the grant of admiralty and maritime jurisdiction under the constitution would not be exclusive. A subject-matter of admiralty and maritime jurisdiction in a state may be included in the exclusive grant of that jurisdiction to the courts of the United States, and be entertained in those courts for the benefit of the people of that state; but it could not be included in the grant, to be merely absorbed in that grant, and not to be exercised in the courts for the purposes of which the grant was made.

If jurisdiction, therefore, of this case rested upon no other ground than that by the law of the state of South Carolina in 1783 it was made a subject for the exercise of admiralty and maritime jurisdiction, and that by the constitution of the United States the state of South Carolina granted an exclusive jurisdiction of all such cases, and that jurisdiction has been given by congress to the courts of the United States, it would be sufficient to maintain the jurisdiction now asked. But it is not necessary for the ascertainment of a right in this court to exercise jurisdiction of this, as a case of salvage, that it should rest upon the ground just stated. It was the continuation and completion of the service commenced by the first libellants, and comes directly within that class of mixed cases, the jurisdiction of which has been declared by the supreme court to be rightfully exercised in these courts. And, if it were not so, that this service is connected with that rendered by the first libellants, but is considered as independent of all others, it would yet be a service rendered from the land to a vessel the locality of which was within the admiralty and maritime jurisdiction given to this court. And if all the agencies employed were on the land, yet, when these were exercised to afford aid to a vessel within that jurisdiction which belongs to this court, there is no principle by which this court can refuse to recognize it. In the Aquila, 1 C. Rob. Adm. 46, Sir Wm. Scott did not refuse to recognize the magistrate as a salvor because the service which he claimed to have rendered to a vessel was rendered by him upon the land, but because it was precisely what he was bound to do; and the case contains a very clear intimation that if the magistrate had done more he would, or might have been rewarded as a

salvor. But in relation to this objection the evidence shows that the essential part of the service of the fire department was rendered upon the tide water, and therefore within the jurisdiction of this court. The streams of water by which the Huntsville was submerged and the fire extinguished were directed and controlled by those of the fire department who were on board of the vessel. It was by the engines on the land that the supply of water was afforded to those who were on board of the vessel; but it was by that part of the fire department who were on board of the vessel that the water so supplied was directed and employed in subduing the fire threatening to destroy the vessel and cargo. The witnesses who have been examined testify that the services of the fire department were directed in searching out the fire, in the vessel by cutting holes in her deck, and thus operating directly upon the fire, successfully overcoming it. The power by which the fire was controlled may have been derived from the land as its source, but it was used upon the decks of that vessel. It is not because I have any doubt that services rendered wholly on land may be well considered as salvage cases, but because I connect the services of the fire department with the services of the Nina, and regard the services of the fire department as performed partly on land and partly on tide water that I have referred to the class of mixed cases of salvage, and in which, as I have said, I think this case must be placed.

It is next objected to the claim of the second libellants that there was a contract for compensation with them, and that this is not consistent with a claim for salvage. A claim for compensation for salvage may be lost if there has been a contract for compensation, without regard to the success of the efforts which have been used to save the property. But that contract which will bar a claim for salvage must be express, explicit, and in distinct terms. Marvin, Wreck & Salv. p. 127. Dr. Lushington says it must be a distinct agreement between the parties for a given sum and in explicit terms. 7 Notes of Cas. Adm. & Ecc. 363. "A sort of understanding," says he, "will not bar a claim for salvage." And in the case then before him, in considering the denial of the parties that they understood the service to be in the nature of salvage, he says: "Suppose it was not, we must look to the service itself which was performed." In The Salacia, 2 Hagg. Adm. 265, it was alleged that the party claiming salvage had fixed a certain sum as the compensation, and had made an agreement for that sum. Sir Christopher Robinson said: "It is probable some such conversation may have passed at the beginning of the service, but it might not be known what would be the extent of it, and the court is not in the habit of considering such loose conversations as conclusive of the merits of any case." The chief of the fire department

is positive in his statement that compensation was only to have been claimed if the vessel was saved; and that the amount of that compensation was to be decided by some impartial tribunal. The mayor of the city testifies that the impression which he received from the conversation between the chief of the fire department and Mr. Caldwell, the consignee, was that the fire department would only receive compensation if the vessel was saved.

Mr. Caldwell, whose testimony is relied upon to prove a contract, does not undertake to say that any specific sum was agreed upon. And in regard to payment to the fire department in case they did not save the vessel he says: Nathan (the chief of the fire department) tendered the services of the department. He (Mr. Caldwell) asked, "What terms?" Nathan said they could arrange the terms, or, if they differed, it could be settled. And subsequently, in the course of his evidence, Mr. Caldwell says it did not enter into his mind to consider what the department would have been paid if the ship had been lost; thinks now he would have paid something, if she had been lost. So far from this being evidence of a contract, express, explicit, and in distinct terms, it does not go far enough to make out what Dr. Lushington calls "a sort of understanding." There cannot then be a rule more proper in this case than that laid down in the case referred to "to look to the service itself which was performed." In considering these objections to the claim of the fire department as a salvage service, and in reaching the conclusion ⸺at they do not affect its right to be so considered, I have been led at the same time to consider the circumstances which entitle it to be adjudged a salvage service. Such other circumstances as have been suggested in the argument are more applicable to the measure of compensation than the character of the service rendered. They will be considered, hereafter, in that connection.

I have also considered at length the question of the right of the fire department to claim as salvors, because the argument on either side was very ably pressed, and because it was the chief question in the case. If they were not salvors, and the service rendered by the fire department was not connected as salvage service with the Nina, it may be doubtful if the first libellants could maintain their libel in that capacity. And this brings me to consider the case as made by the first libellants, the owners of the steamer Nina. In doing so, I shall first consider the circumstances which determine the character in which they are to be regarded, and then such as affect the measure of compensation. At the time when the Nina afforded aid to the Huntsville, she was exposed to two perils, each distinct from the other. She was ashore, and she was on fire. To be saved it was necessary that she

should be floated. By being floated she would be more able to escape the danger of stranding, and being floated without prolonged delay, and being able to reach some place at which the fire raging within might be controlled, were involved all the chances of escape from that peril. Whatever assistance was afforded her by which she was enabled to escape from the place at which she had run ashore, if she was thereby saved, was a salvage service. If that service in so relieving her enabled her to escape the peril of stranding, it became more valuable in proportion to the imminence of that peril. If the escape from the shore enabled her to escape the peril of stranding, and, in addition thereto, enabled her more readily to overcome the additional peril of fire, it becomes of course more valuable in proportion, in which that second peril was imminent. And if, in addition to her extrication from the place at which she was ashore, she was further assisted by being towed to the place at which the peril from fire could be overcome, the service is again made more valuable according to the time gained for the Huntsville by this aid. And it is in these several relations towards the Huntsville that the claim of the owners of the Nina must be considered.

Before, however, I proceed to the examination of the evidence in relation to this part of the case, it is more necessary to determine the relations which the first and second libellants, the owners of the Nina and the fire department bear to each other. There is no principle in regard to salvage more unquestionable than that the claim for salvage can only be allowed when the property that has been exposed to peril is restored in safety to the owner. No matter how daring may be the attempt to save, nor how meritorious the service rendered to the vessel in distress, without success they furnish no claim to reward. The property must be effectually saved. It must be brought into a port of safety, and it must be there in a state capable of being restored to the owner, before the service can be deemed completed. The Henry Ewbank [Case No. 6,376]. If this principle should be applied to the first libellants, they could not claim compensation as salvors. If they did rescue the Huntsville from stranding, and if they did tow her to the city of Charleston, she was still exposed to a greater peril than that from which they had relieved her. All of the witnesses, with one accord, declared the fire to be the greater peril, even when she was ashore. With the lapse of time that peril must have been fearfully increased. And no ingenuity can sustain the position that a vessel in which a fire has been burning for many hours could be considered in that condition as in safety or capable of being restored to the owner as saved. It was contended that when the vessel had been brought to the wharf,

thereupon arose a legal obligation, upon the fire department to save her. Doubtless, if I concurred in that opinion, all which has been urged to sustain the claim of the first libellants as the only salvors would have much more weight. But the evidence has satisfied me that this position is not well taken. But, although the services of the first libellants did not result in placing the vessel in safety, if thereby she was placed in a position in which she could receive that aid, which the first libellants could not afford, and because she was in that position other persons were enabled to render aid, and by that aid she was saved, the first libellants will, in that case, be entitled to claim compensation as salvors. And it is upon this principle that the first libellants must maintain their claim. And this court, regarding the whole service of saving the vessel from both perils with which she was threatened, and having decided the proper compensation for that service, will divide it among the parties according to their several merits. Marvin, Wreck & Salv. 142; The Henry Ewbank [supra]; 3 Hagg. Adm. 156.

It has been urged in behalf of the respondents that where the first and second libellants have denied their co-operation with each other that the court would not by its decree establish a connection which they denied, and that all the consequences, which it is said would follow from this voluntary severance by them, of all relations with each other, should be devolved upon them. But it is not remembered that in cases like this there are considerations presented to the court stronger than any which can be urged in connection with the private claims of individuals. Every case of salvage is to be considered in connection with that public policy which creates the right and regulates the amount of compensation in such case. And each case is determined not only by the circumstances which are found in it, out also by a regard to the general welfare. Hence a second set of salvors who have unnecessarily obtruded themselves upon other salvors, will not be allowed compensation, although they may have rendered service And in like manner, if a salvor who really requires aid shall refuse it when proffered, with the hope thereby of increasing the compensation he shall receive, and if, in consequence of his conduct, the property is not restored to the owner in as good a condition as it would have been if such aid had been accepted, he will not be rewarded as he expected and desired. If in this case, the salvors have discharged their duties in good faith to the vessel, and by their services the vessel has been saved, it is the duty of the court to determine their true relations, and to award proper compensation to them. Their compensation is measured by their services, and is not affected by a difference among themselves as to the value of the services by them respectively rendered. It

is natural that among several salvors each should consider his service the most efficient. But these differences are to be settled by the court, and they afford no proper objection by the party who has received the services to that compensation which has been fairly claimed. It is not to be presumed in such a case that they intended to abandon their claim to compensation, nor will the court so regard it. That the perils from which the assistance alleged to have been offered by the first libellants aided the escape of the Huntsville were sufficient to justify these first libellants in claiming to be salvors is too clear to need illustration. What, then, was the value of the services rendered by the Nina in aiding the Huntsville to escape from the peril of the breakwater? The danger consisted in the Huntsville working up to the breakwater. Did the Nina contribute aid to prevent this? Two hawsers were passed from the Huntsville to the Nina, and by the combined aid of the steam of the Nina and the anchor she had out the Huntsville was kept in her position. This was the object to be accomplished. By it the Huntsville was to be kept from working up to the breakwater, and be more easily floated off with the flood tide. Was this accomplished? That it must have been understood as calculated to exercise some control over the Huntsville is obvious from the fact that the captain of the Huntsville and the pilot in charge of her anxiously reminded the captain of the Nina that with all these aids they were still heading on to the breakwater. And if with these counteracting forces the Huntsville did still work on to the breakwater, it is clear that without these her progress to the breakwater must have been much more rapid, and her danger much more impending. It is true that the captain of the Huntsville says that in this the Nina did him no good; and the examination of the witnesses was directed to the point that the anchor of the Huntsville would have afforded all the aid the Nina rendered. But although the captain of the Huntsville thinks the Nina did no good, he evidently disapproved of the cutting of the hawsers, which for a time separated the vessels; and most inconsistent is the idea of a vessel keeping her signal of distress flying when she could relieve herself by carrying out her own anchors. Such pleas are not favored. If the assistance of a salvor is sought (and how is it more distinctly sought than by a signal of distress?) and if his assistance is received (and how is it more absolutely received than in complete obedience to all his directions?) it is not competent for those who have asked and received that assistance to insist that by their own resources they could have saved themselves. I have endeavored to satisfy myself of the precise extent of the agency of the Nina in relieving the Huntsville from her position near

the breakwater. She floated, however, at a moment when it would seem the increase of difficulties produced by the approach of the Keystone State had temporarily diverted the attention of all. But if the evidence does not give to the Nina all the credit for the extrication of the Huntsville, it is equally far from taking away from her a large share of the credit, due to several causes, operating at the same time, in combination with each other, but without any means of determining their relative value in accomplishing that result. Of all the causes thus operating to relieve the Huntsville that connected with the Nina alone was operating voluntarily, and for the purpose of affording relief. After the hawsers had been cut and the Huntsville had passed the breakwater, and the peril of stranding had been avoided, she was taken in tow by the Nina, and assisted by her in reaching the wharf at which she was permitted to come. This, the continuation of the service commenced at the breakwater, deserves to be carefully considered, because if there was at this time assistance offered by the Nina, it was rendered at a time when to the Huntsville it was of the utmost consequence. The escape of the Huntsville from the danger of stranding was at once an escape from a peril, and a necessary means in facilitating her escape from a still more imminent peril with which she was threatened. But, when thus relieved, to be saved, it was necessary that she should be enabled to reach a certain designated wharf before the flames within her would burst forth. Had the report of the officer sent by the mayor been unfavorable, or had the flames burst forth from her before she reached the wharf, the permission of the mayor would have been withdrawn; and for the purposes of this case her destruction would have been inevitable. Nor does it affect this conclusion to suggest that she might have been scuttled and sunk. How far this would have contributed to her restoration to her owners, and, if she could have been restored after this process, at what proportion her value would have been diminished, has not been explained by any testimony, and probably is a matter of which explanation cannot be given. Captain Coste, who gave expression indirectly to his opinion on this subject, certainly considered that to make her safety consist in scuttling would require careful preparation for it. For its success a place had to be selected. It was not a remedy to be adopted or used unless resolved upon and arranged for in many particulars. And when for it no arrangement was made, nor preparation of any kind made, however it may be hereafter regarded in considering it, as a circumstance operating to diminish the compensation to be given to the fire department, in regard to the Nina, and in connection with this part of the service which it is claimed she rendered, it cannot

have any influence. The Huntsville then must be considered as confined for her safety to the means she possessed of being able to reach the only wharf, to which she was permitted to come, and at which wharf she could receive the aid of the fire department. And it was not only necessary that she should be able to reach this particular wharf, but that she should reach it with all possible quickness, and before the flames burst forth. The service rendered by the Nina at this time depends upon the conclusion to which we are led by the testimony as to these two points. Did the Nina assist the Huntsville in reaching Southern wharf, and could the Huntsville have reached that wharf without the aid of the Nina? Did the Nina enable the Huntsville, if she could have reached Southern wharf without her aid, to reach that wharf sooner, than if she had been unaided?

Limiting the place of safety to that wharf, at which only the Huntsville was permitted to come, and at which the means of saving under the control of the fire department were to be had, and referring to the evidence for the purpose of ascertaining whether that wharf could have been reached by the Huntsville with no other agencies to assist her but the wind and the tide, it will appear that no witness entertains the opinion of her ability to do so. Some of the witnesses express the opinion that she would have drifted to some other part of the city wharves, but all concur in the opinion that she could not have been managed, so as to be brought with any certainty to the wharf designated for her. But as this wharf was the only wharf at which she could be brought, and the only place at which she could obtain the means of safety, it is alone to be considered in determining the value of the resources it is urged that she possessed, and by which she could reach that place. And if, to enable her to reach this wharf, the aid of the Nina was essential, and that aid she received, that aid must be considered an important service (not of itself insuring safety, but connected with others), which alone could be expected to secure safety for her. Did this aid, so rendered by the Nina, enable the Huntsville to reach Southern wharf sooner than she could have otherwise done? What has been already said serves to show that the aid so rendered was essential to her reaching that wharf, and, if so, the same aid was valuable in the saving of time which it occasioned. The pilot who was in charge of her testifies that the Huntsville could not be steered, and other witnesses have spoken of the difficulty, from this cause, which the Nina had in towing her. It is true that Captain Coste had testified that he did not attach much consequence to the fact that she could not be steered, but the pilot, whose attention to the vessel, and whose experience, combined with his disinterestedness, make him a very reliable

witness, undoubtedly considered it one of the pressing disadvantages under which she labored. The retardation of her course in consequence of her inability to be steered, in his judgment, made her passage to the city twice as long as it would have otherwise been; and that by the aid of the Nina she was enabled to reach the wharf to which she was permitted to come, and by the same aid was expedited in her course, and that in consequence thereof she was enabled to reach a place at which, by the application of other agencies, she was saved from the peril of fire, are conclusions directly established by the evidence. If we consider that without the aid of the Nina the Huntsville could not have reached the city (for the service of no other steamer could be had), and that the delay of another hour in reaching the wharf would have involved the total destruction of the Huntsville, it is not easy to overestimate the importance of that time so gained, or the agency by which in gaining that ultimate safety was secured.

Regarding this, then, as a case of joint salvage, it is now proper to consider the proper amount of compensation, and its division among the salvors. There was not, in any part of the service rendered by either salvors, any immediate risk of life, nor was the property employed in saving the Huntsville exposed to any great risk or danger. But the services were in themselves highly meritorious, and by them a very valuable vessel has been preserved. Without them, I cannot doubt that she would have been wholly consumed. To the voluntary proffer of the services of the fire department in aid of a burning vessel many miles distant from the city, to the influence of that offer upon the mayor in securing his assent to her being brought to the city, and to the efficiency with which the services of that department were rendered, must we refer as a chief part of the efficient causes, which led to the safety of the vessel and cargo. It was said that she could have been scuttled at the wharf, but the location in which she was placed at the dock, under the direction of her captain, makes it extremely improbable that such an attempt could have been made with success. I cannot balance against the aid which was rendered so promptly and efficiently the suggestion of any other proceeding concerning the practicability of which there is no positive evidence, and of the inferiority of which there would seem to be no higher proof than is found in the fact that it did not at any time present itself to captain or pilot who were in charge of the Huntsville as a resource to which they might resort.

Of the value of the property saved the evidence is not as clear as might be desired. I think it may be safely placed, at the time when it was saved, at $60,000, exclusive of the cargo. That the salvage service was in part rendered by a steam vessel and to a steam vessel has always been regarded as justifying a higher rate of compensation than would be given to sailing vessels. And upon this value of the vessel, and such circumstances in the case as are proper to be regarded, I consider the salvors entitled to compensation at the rate of 12 per centum, or an amount equal to $7,200. The rate of compensation is in accordance with the decisions which have been made in this court in cases which may to a certain extent be considered as an authority in this upon the question of the rate of compensation. The Wm. Penn [Case No. 1,965]. In The Delphos [Id. 14,400], a much higher rate of compensation was given. Upon the cargo which was saved, amounting to $19,733, the same rate of compensation will be charged, amounting to $2,367.96. The aggregate compensation will be $9,567.66, and of this amount one-third, or $3,022.65, will be given to the first libellants, owners of the steamer Nina, and such as are entitled to share with them, the proportion of the several parties to be fixed by the decree. Two-thirds or $6,545.30 will be given to the second libellants, composed of the Incorporated Companies of the Fire Department and the persons who by their labor at these engines, are entitled to claim as salvors. Of this sum so awarded, or two-thirds as now stated, another division shall be made into nine parts. One-half of each ninth part shall be paid to each of the incorporated companies owning and employing its engine and appurtenances, the other half of each ninth shall be divided among the several persons members of each of the said companies engaged in working the said engines, so that each member of the several companies shall receive the same compensation. And for the purpose of ascertaining the actual salvors, a reference is now ordered to the commissioner, with directions to enquire and report the actual salvors on board of the Nina; the capacities in which they served; how many white, how many colored; of the colored, how many, if any, were free, how many slaves; and to whom they belonged; in the fire department, the number and names of the actual salvors whose services were given as firemen in extinguishing the fire in the Huntsville. And the commissioner is directed further to report any special matter in relation to the salvors, or any of them. It is further ordered that the said commissioner file his report touching these matters now referred, and thereupon a decree will be entered in conformity with what is now stated, and also for the costs of these proceedings.

[Commissioner Eggleston filed his report in this cause November 6, 1860, and on the following day the court rendered its final decree as follows:]

On hearing the report of the commissioner upon the several matters referred to him under the order of this court, it is now ordered,

adjudged, and decreed: That the respondents pay into the registry of this court the sum of $9,567.96 for the salvage service rendered in this case, and that they do also pay the costs of these proceedings to be taxed by the register. That of the said sum of $9,567.96 the sum of $3,022.65 be allotted to the libellants who are the owners, captain, and crew of the steamer Nina; and of this amount that the register pay to the several parties herein named or their proctors the following sums; that is, to the owners of the Nina, including therein the compensation for the negroes, either owned or hired by them, and comprising the crew of the Nina, $2,500; to Isaac Davis, captain, $400; to W. R. Poyas, engineer, $100; to J. H. Murray, mate, $51.33; to S. S. Herring, watchman, $51.33. That of the said sum, $9,567.96, the sum of $6,545.31 be allotted to the libellants the nine incorporated fire engine companies, and the members of the same specially set forth in the report of the commissioner. Of this sum one-half, or $3,272.65½, be divided into nine equal parts, one of which—that is, the sum of $363.62 5/6 —shall be paid to each of the said companies or their proctors. Of the remaining one-half, or $3,272.65½—a division thereof shall be made into 310 equal parts or shares, one of which part or share—that is, the sum of $10.55⅔—shall be paid to each of the parties named in the report of the commissioner or to his proctor.

<hr />

HUNTSVILLE. The (ROBERTS v.). See Case No. 11,904.

HUNTT (COPE v.). See Case No. 3,206.

HUNTT (WHITNEY v.). See Case No. 17,-589.

HUPPENBAUER v. U. S. See Case No. 3,-097.