## THE KATIE COLLINS.

(*District Court, D. Delaware.* July 29, 1884.)

1. SALVAGE—PUBLIC POLICY.
    Salvage exceeds a fair remuneration for work and labor, the excess being intended, upon principles of sound public policy, not only as a reward to the particular salvor, but also as an inducement to others to render like services.

2. SAME—WANT OF SKILL OR ENERGY ON PART OF SALVOR.
    But salvage may be reduced by want of skill or energy displayed by the salvors, or even forfeited by their misconduct or gross negligence.

3. SAME—STRANDED VESSEL.
    Where salvors, having the management of the business, fail to get a stranded vessel afloat at the first high water at which she might have been floated, had they employed the proper means, they must be considered as having failed in point of skill and energy, and must suffer the just and legal consequences of such failure, notwithstanding they may have saved the vessel and cargo.

4. SAME—MISTAKE OR ACCIDENT.
    Where, by mistake or accident, salvors, in attempting to haul off a stranded vessel, misplace a beach-anchor and thereby unnecessarily prolong the work, they will not be entitled to a compensation much, if any, in excess of their actual expenses.

In Admiralty.

*Henry R. Edmunds* and *Theodore M. Etting*, for libelants.

*Henry Flanders* and *Curtis Tilton*, for claimants.

WALES, J. The schooner Katie Collins, laden with lumber and bound from Jacksonville, Florida, to Perth Amboy, New Jersey, went ashore on the Viginia coast, about seven miles south of Chincoteague island, at midnight on the thirtieth of October, 1881. The disaster was attributed to mistaking the Chincoteague light, on her starboard bow, for the head-light on a steam-ship. The next day her captain sent a message to the nearest telegraph station, to be forwarded to the libelants at Norfolk, Virginia, requesting them to come to his assistance at once. This message was received by the libelants at 12 o'clock M. on the first of November, and they immediately made preparations to go to the relief of the stranded vessel, distant about 80 miles from Norfolk and 50 miles from Cape Charles. The wrecking schooner B. & J. Baker, of 100 tons burden, owned by the libelants, supplied with a beach-anchor, hoisting engine, steam-pump, and other necessary appliances used in the wrecking business, with a crew of eight men all told, left Norfolk the same night, in tow of the tug Nettie, for Hampton roads. On the morning of November 2d, the Baker was taken in tow by the Rattler, a larger tug, which had come from Baltimore by order of the libelants, and was brought round to the vicinity of the Collins, coming to an anchor a few miles to the southward, for fear they might pass her in the dark. Early on Thursday, November 3d, Nelson, the wreck-master in charge of the expedition, anchored directly off the Collins, at the distance of about 200 fathoms. His first step was to take the soundings, rowing

as nearly in a straight line from the Baker to the Collins as he could. He found the depth of water at the Baker three fathoms, running in at that depth for about 100 yards; then it rapidly shoaled, until in two casts he had less than two fathoms, next nine feet, and at the stern of the Collins between six and seven feet, with the breakers close to her bow. The Collins drew 11½ feet aft and 10½ forward, and was heading nearly north-west. The coast line here runs south-south-west. From 200 to 400 yards to the north of and parallel with the Collins was a reef formed by the Assawaman inlet, and extending some considerable distance seaward. After placing the hoisting engine on the Collins, the wreck-master, with the aid of the crews of the Baker and the Rattler, attached the cable to the wreck, preparatory to putting the beach-anchor in position. The tug then took the Baker in tow, under the command of Nelson, and, to use his own words, "When I got near the direction where I wanted to place the beach-anchor, his tow-line parted and I let go the beach-anchor, which was then as near a right angle from the line of breakers where the schooner laid as I could judge. Hove taut, and the vessel moved some that night astern at high water." The whole of this day had been spent as thus described, and on the supposition that there would be no further use for the tug, it was discharged. On November 4th steam was raised in the hoister, and the cable hauled taut, but the vessel did not move because there was no tide. Nelson thought she moved some on the night tide. November 5th the weather was stormy, some sea washing over the starboard side of the Collins, and no effort was made to haul on the evening tide. The sea went down some time after 9 o'clock. On Sunday, the 6th, she went astern, but there was no increase in depth of water, and the vessel still remained about two and a half feet in the sand and mud, at high water, the rise and fall being then about four feet. On Monday, the 7th, the vessel continued to move astern. On this day the Baker slipped her moorings and sailed to the southward for a harbor, it being very rough at the time, and the sea washing over her bow. By the departure of the Baker the wreck-master was left with eight men, including four belonging to the Collins, two of the latter being disabled by sickness and working only half time. On Tuesday, the 8th, part of the deck-load was thrown overboard, consisting of car stuff, pitch pine, and very heavy, and that night she moved some astern at high water. At this time she was leaking some, and resort was had to the hand-pumps. Wednesday, the 9th, the work of throwing off the deck-load was prosecuted more rapidly by the aid of the steam-hoister, the object being to lighten the vessel at the stern, and the pumping was continued. Thursday, November 10th, the cable was hauled some on both tides, and by keeping the pumps at work six feet of water in the hold were reduced to three. Since Tuesday she had been hauled 75 feet or more. On Friday and Saturday there were some movements astern. On Sunday, the 13th,

after the vessel had stopped moving astern on the morning tide, the steam-pump and boiler were brought on board from the Baker, which had that day returned to her anchorage off the Collins, and the latter was pumped out between 9 and 10 o'clock, and hauled some astern that night. Monday morning, the 14th, the tug Battler arrived, in answer to a requisition made by Nelson on the libelants at Norfolk, during the absence of the Baker, for a steam-pump, and brought three extra men for the wrecking crew. The Collins was hauled some astern on the morning tide, but scarcely moved at evening, as the tide did not make much, and there was very little sea. Nelson says he expected to see her float on that night's tide, and kept the tug there to tow her up to Wilmington. Lib. test. 56. On Tuesday, the 15th, the sea being smooth, the tug went along-side of the Baker, and their joint crews hoisted the beach-anchor. "The tug boat towed us out from the schooner Katie Collins the full length of the cable and chain. Then we let go the anchor." (The respondent's witness, Lewis, says that after the anchor had been shifted, the hawser was "straight astern." Resp. test. 51.) "I then discharged the steam-tug, as the wind was westerly, and making very low tide and smooth sea." "We hove some on the cable that night, but the vessel did not seem to move any. I think we hove by the windlass." Lib. test. 57. Wednesday, the 16th, was occupied in securing the remainder of the deck-load and moving it forward so as to trim the schooner by the head. The tide was very low, and the vessel leaked very little while lying still in a bed of sand. Thursday, the 17th, "we hauled on the vessel by the windlass; she moved very little." Friday, the 18th: "It began to make some sea during the latter part of the night before, and about between 12 and 1 o'clock I got up, and at 2 o'clock had all hands on deck, and the vessel began to go astern." Nelson, Lib. test. 59. Before the tide fell the Katie Collins was afloat. The distance of the beach-anchor in its first place from the Collins was 175 fathoms or more, in a S. S. E. direction, and half of the cable had been hauled in before the anchor was lifted and changed to another position. "I changed it because I wanted to discharge the steamer, as the wind was westerly and I knew it would take some little time before the vessel would float, as a westerly wind makes low tides and a smooth sea." Nelson, Lib. test. 64. Keeping the steam-pump on board, Nelson took command of the Collins, and sailed the same morning for Wilmington. The wind was strong and fair, but the rudder-stock was sprung and the vessel steered badly. On Saturday, the 19th, between 5 and 6 A. M., she ran aground to the northward of ship John Light, in the Delaware bay, and laid there until about dark, when she was spoken by the tug Inca and taken in tow to the Christiana, where she arrived the same night. This is substantially the wreck-master's narrative of the work, as it progressed from day to day, of hauling off the Collins and bringing her to Wilmington.

After testimony had been taken on both sides, and before the ar-

gument in the court, a motion was made on the part of the respondent for leave to amend his answer by striking out the last sentence thereof, and inserting in lieu of the same these words, to-wit:

"On the contrary the respondent avers, by reason of the premises, and by reason of the damage and injury done to said schooner by the unskillful manner in which said salvage services were performed, the libelants have either wholly forfeited all claim to a salvage reward, or should be awarded such a sum as will place their claim as in the lowest order of merit," etc.

Due notice was given to the libelants of the intention to submit this motion, and of the taking of additional testimony under the amended answer. I can see no valid objection to the allowance of this motion under the twenty-fourth admiralty rule, and as it is made to the discretion of the court, it has been granted without terms. From the additional testimony it appears that about two months before the Collins went ashore she had been largely repaired, nearly rebuilt, and that after she was hauled off upwards of $2,000 were expended in putting her in good condition. The answer, as originally filed, denies that the officer and men employed by the libelants were skilled for the salvage service by them undertaken, "but, on the contrary, said officer did not evince a high degree of intelligence in directing his efforts, and spent twelve days in fruitless exertion, and finally abandoned a course of action which the master of the schooner, from the beginning, condemned and protested against."

It is contended by the respondent that the work of getting the vessel off was unnecessarily prolonged by the want of good judgment and intelligent action on the part of the salvors, and that in consequence of this, and of their unskillful management, the vessel was badly strained and damaged by pounding on the beach for so many days, when by proper means and well-directed efforts she could have been floated in a few hours. The respondent insists that the first position of the beach-anchor was the result of an accident—the parting of the Rattler's tow-line just before it was let go, when the Baker was to the south and off the port quarter of the Collins. The admissions and conduct of Nelson and the log-book of the Collins, as well as the testimony of the respondent's witnesses, go very far towards sustaining these positions, which are still further supported by the speedy floating of the vessel after the beach-anchor was moved directly astern of her. The statements of the members of the working crew are contradictory or conflicting, but the actual occurrences, as detailed by all of them, appear to confirm the causes of delay as alleged by respondent. The master of the Collins protested against placing the anchor so far south, instead of directly astern, by asking Nelson "if he was going to haul her off sideways." Nelson's excuse is that he laid the anchor in a southerly position from the Collins, because there was nearly a dry shoal to the northward of her, and the direction of the anchor was the nearest for deep water. In the opinion of others this shoal or reef was of advantage in affording

protection from the north and east winds and the ocean currents. The prospective peril was a south-east gale, which did not come.

After looking at the whole testimony, and observing the slow and at times scarcely perceptible progress made by the salvors, it is difficult to resist the conclusion that they were unfortunate, at least, in the outset, and that, having committed a mistake in letting go the anchor so far to the south, they were equally unfortunate, if not willfully in fault, by persisting in keeeping it there so long as they did. They worked from the third to the fifteenth of November, with the cable at a considerable angle with the length of the schooner, dragging her sideways down the beach. Nelson admits that the cable was two points to the south; others testify to four or five points. Lib. test. 74. After between one-half and two-thirds of the cable had been hauled in, she still remained fast in the sand. Nine hundred feet out from the place where the schooner ran ashore were two fathoms of water, (Lib. test. 78,) and there was no necessity for changing the position of the anchor, if Nelson's theory was correct. The cable and chain were 175 fathoms long, of which 130 had been hauled in. Twenty fathoms more would have floated the schooner, if the anchor had not previously dragged, and Nelson was positive that it had not. Lib. test. 76. After the anchor was moved, on Tuesday, the fifteenth of November, the tides were lower, owing to the prevalence of westerly winds, and the vessel made very little progress until early in the morning of Friday, the 18th, at high water, when she went off. Lib. test. 57. The water had been higher before the 15th than it was after that day, and the schooner finally floated on a medium tide. It is apparent that the wreck-master was either deficient in judgment and skill, or that he erred against his own knowledge and experience in keeping the anchor where it was first planted for such a length of time, and this, too, in the face of the protest of the master of the Collins, of the complaints of the men, and of the inability of the wreckers to get her off.

The prompt movement of the schooner on a moderate tide, after the cable had been moved directly astern, makes the original mistake more glaring. The testimony of the respondent's witness, Lewis, allowing it equal credit with that of Nelson, proves the first position of the anchor, whether accidental or designed, to have been wrong. Lewis is a wrecker of 20 years' experience, familiar with the business, and speaks with confidence. He went to the wreck on the Saturday before the anchor was shifted. He says the anchor was about S. by W. from the vessel. It led out of her port-quarter chock, and in his opinion it was impossible to heave a vessel off broadside that was buried 15 inches keel down in hard sand. After the anchor was shifted the hawser led about S. E. by E., as near as possible, and in three tides the vessel came off. If the beach-anchor had been placed directly astern in the first instance, she would have come off on the first tide, as the tide on which she floated was lower than they had had. This

is the substance of Lewis' opinion on this point.   Resp. test. 48–51.
It is clear that with the cable running at an angle off the port quarter
it would require greater power to move the vessel than if the force
had been applied directly astern.   Nelson says the effect of the pur-
chase was to move her around and gradually astern.   Lib. test. 64.
Again: "She would slew her stern a little to the southward while go-
ing astern, and while the tide was falling she would slew back again
nearly in her former position."   Nelson, Lib. test. 93.   The Baker
had the means of properly laying and taking up the beach-anchor
and cable, weighing, respectively, 4,000 and 3,500 pounds, but it was
more difficult to change the position of the anchor, as, the cable being
wet and heavy, there would be a great deal of extra weight to drag.
Lib. test. 69.   This may explain but does not justify the delay in mov-
ing the anchor.   The barge Baker was absent, with the much-needed
steam-pump, from Monday till Saturday.   She had sailed for a har-
bor from an impending storm, which soon subsided, and could not
return until her crew had been increased.   The two trips of the tug
Battler would not have been necessary had the Baker remained at
her anchorage, or had been able to return there in a day or two.
Nelson and Lewis agree that the anchor could have been raised and
shifted to its new position by the Baker without the aid of the tug,
and on the first arrival of the latter with the supplementary steam-
pump, one had already been put to work on the Collins.   The second
trip of this tug was of still less service to the respondent.   The
schooner went ashore at a right angle to the coast line, and the nat-
ural plan, under ordinary circumstances, would have been to draw
her off in the same direction which she went on, but Nelson chose to
try the experiment of working with an indirect purchase, and thus
converted an accident into a blunder.   The log of the Collins shows
that on the fourth of November her first movement was "by the stern
around the S. W. three-quarters of a point."   The next day the tide
was too low to start her.   November 6th she went 20 feet astern.
November 7th, "Worked her width to the south-west, or down the
beach."   November 8th, "Slewed her stern about one-half point down
the beach."   November 10th, "Hove her about fifty feet astern and
sideways down the beach."   November 14th, "Moved her a little
astern down the beach, sideways."   The next day the anchor was
moved.   The number of men employed by the libelants during the
progress of the work, including the crew of the Collins, did not exceed
eight or ten, except when assisted for a few hours by the crews of the
tugs.   The weather was neither tempestuous nor severe.   The lives of
the salvors were not endangered, and the salving property was sub-
jected to a minimum of risk.   The value of the Baker, with all her
appliances, did not exceed $5,000, and probably $3,000 would be an
ample estimate.   The tug-boats employed were not at the risk of the
libelants.   The agreed value of the Collins and her cargo is $10,000.
   The Baker Salvage Company, with a capital of $90,000, is regu-

larly engaged in the wrecking business, and hold themselves in readiness at all seasons to go to the assistance of wrecked or disabled vessels. Their occupation is not only legitimate, but highly useful and important, and deserves to be encouraged. Salvage service fairly and skillfully rendered is entitled to more than ordinary compensation, as measured by the value of the same work done on land, but each case must be dealt with according to its own peculiar circumstances; and while the nature of the service is the same, the degree of merit to be awarded to the salvors depends upon their individual conduct: (1) The risk incurred by them; (2) the degree of danger from which the lives or property are rescued; (3) the value of the property saved; (4) the value of the property employed by the salvors in the wrecking enterprise, and the danger to which it is exposed; (5) the skill shown in rendering the service; and (6) the labor expended and the time occupied. *Post* v. *Jones*, 19 How. 161; *The Sandringham*, 10 Fed. Rep. 573. The learned judge who decided the last-cited case adds, as additional matters to be considered, the degree of success achieved and the proportions of value lost and saved. Where all these ingredients of salvage service concur, a large and liberal reward ought to be given; but where none or scarcely any are found, the compensation can hardly be denominated a salvage compensation; it is little more than a mere remuneration *pro opere et labore*. Marv. Wreck, § 99. Salvage exceeds a fair remuneration for work and labor, the excess being intended, upon principles of sound public policy, not only as a reward to the particular salvor, but also as an inducement to others to render like services. The claims of simple justice to the salvor do not ordinarily extend beyond a fair compensation for work and labor. All beyond this is a gratuity given or withheld by the courts upon grounds of public policy. But salvage may be reduced by want of skill or energy displayed by the salvors, or even forfeited by their misconduct or gross negligence; and the neglect, misconduct, or inefficiency of the master are imputed to the owner of the salving vessel,—especially of a wrecking vessel, for the master is then acting within the scope of the employment for which he was selected and appointed by the owner. Thus, whenever salvors, having the management of the business, fail to get a stranded vessel afloat at the first high water at which she might have been floated, had they employed the proper means, they must be considered as having failed in point of skill and energy, and must suffer the just and legal consequences of such failure, notwithstanding they may have saved the ship and cargo. If, in consequence of want of skill in sounding out channels, carrying out anchors, or navigating the vessel, or from any other omission of proper care or skill, the salvors incur unnecessary delay in extricating the vessel from its perilous situation, or get it ashore a second time, the salvage ought to be reduced in proportion to the degree of negligence or want of skill; and when the negligence is gross or willful, it should be wholly for-

feited.   Marv. Wreck, §§ 106, 108, 219; *The Blackwall*, 10 Wall. 14.

The libelants promptly responded to the call for assistance made by the captain of the Collins, and proceeded with commendable dispatch to her rescue, but the subsequent management of the wreckmaster was ill judged, and in consequence there was unnecessary delay in completing the work of hauling off the schooner. ' It is evident that the beach-anchor was at first misplaced, and the result was that the men employed by the libelants worked at a great disadvantage and with consequent injury to the schooner, which was pounded and strained for two weeks, when probably as many days would have been a sufficient length of time for the service actually rendered.   There was also culpable delay in throwing over the deck-load, which was not begun until after the lapse of five days from the time the wreckmaster went on board the Collins.   The steam-pump was wanting for 10 days, when there was the greatest need of it to lighten the vessel.   The hoisting-machine was not in good order, and gave out at the end, when the vessel was hauled off by the aid of her windlass. The chapter of accidents, or of mistakes, errors of judgment, and want of skill, was concluded by running the rescued vessel aground in the bay while yet in charge of the libelants.

The hiring of the tug Battler was really of no service to the respondent, as she was employed on her first trip to hunt up the Baker, which had run into Metompkin inlet for a harbor, some 12 miles south of the Collins, and could not return until her crew had been reenforced.   The steam-pump brought by the Battler was of no use, because the Baker came back to the wreck before the tug arrived. The tug's second trip might have been of use, and her employment then cannot be deemed altogether an unnecessary precaution.

Under this finding of the facts I confess to have felt much embarrassment in fixing the amount of compensation which should be given to the libelants, and have concluded, after a careful review of the law and evidence, that this court would not be warranted in decreeing a sum much, if any, in excess of the total amount of moneys actually expended by the libelants in their undertaking.   Certainly they did not exercise the highest degree of skill, or apply their knowledge, experience, and energy to the best interests of the respondent.   Their negligence and misconduct were not so gross, however, as to forfeit all claim for compensation, but sufficient to reduce the amount which might have been awarded to them had they acted with more intelligence and energy.

The actual outlay of money by the libelants, including what was paid for the hire of the Battler, of the propriety of which there has been some doubt in my mind, was about the sum of $1,253.45, and for this amount a decree will be rendered with costs for the libelants.