# THE HALCYON.

(Circuit Court of Appeals, Ninth Circuit.    January 8, 1917.)

No. 2830.

1. SALVAGE ☞26—AMOUNT OF COMPENSATION—NEGLIGENCE IN PERFORMANCE OF SERVICE.

A schooner was broken from her moorings to a wharf in a harbor in Hawaii at night by a heavy wind and drifted into a dangerous position near the shore.  On her call a steamer came to her assistance, and had towed her some distance out into the bay when the line parted and the schooner anchored.  It was then daylight, and the steamer soon saw that the schooner was dragging her anchor, but did not go to her assistance until she had again drifted into a dangerous position and called for help, which was between one and two hours after she commenced drifting. *Held*, that the steamer's service was one of salvage, but that she was negligent in not going to the assistance of the schooner a second time immediately when the latter was seen to be dragging her anchor, and that the salvage award should be fixed on the basis of the service she would have rendered if she had done so, without taking into consideration the peril of the schooner at the time of her final rescue.

[Ed. Note.—For other cases, see Salvage, Cent. Dig. §§ 57–64, 68, 84.]

2. SALVAGE ☞26—AMOUNT OF COMPENSATION—PROMPTNESS AND SKILLFULNESS OF SERVICE.

It is the theory and policy of the law of salvage to promote intrepidity, promptness, and skill in rescuing the imperiled vessel, and lack of skillful operation, with or without injurious results, may diminish the award; while, on the other hand, the skillfulness of the rescue may influence the award by increasing it.

[Ed. Note.—For other cases, see Salvage, Cent. Dig. §§ 57–64, 68, 84.]

Appeal from the District Court of the United States for the Territory of Hawaii; S. B. Dole, Judge.

Suit in admiralty for salvage by Inter-Island Steam Navigation Company, Limited, owner of the steamer Niihau, against the schooner Halcyon; J. A. T. Olson, master and claimant.  Decree for libelant, and claimant appeals.  Modified.

In a proceeding *in rem* for salvage, the court below found the facts to be substantially as follows: On the night of January 12–13, 1914, the schooner Halcyon, laden with a cargo of lumber, was lying in the port of Hilo, Hawaii, a little way off the wharf, moored to the wharf and to buoys on the port side. A heavy wind came up from the north which caused her to drift, breaking a line attached to a buoy, and to collide with a smaller schooner moored near her stern.  The schooner called for assistance from the steamer Niihau, which was lying anchored in the harbor with steam up.  The steamer raised her anchor and came down the wind near the schooner, anchored, and sent a towline by boat to the schooner, which had then drifted close to the shore near the mouth of the Wailoa river, a position which was dangerous.  The steamer was towing the schooner to a place out in the bay, when the towline parted.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

The schooner, which had already lost an anchor, dropped her other anchor. The steamer also came to anchor. "In a few minutes," as the court below found, it was evident to the master of the steamer that the schooner was drifting again toward the sandy shore on the west side of the mouth of the Wailoa river. The steamer approached her and reached a position a little way to the windward. The schooner raised a signal for assistance, and about that time a boat with a towline left the steamer and came down the wind on a surf line, and delivered the towline on board the schooner, and fastened the same to her bow. The boat then returned to the steamer and brought another and larger line, which was also fastened to the schooner. The schooner was then pulled out of the position in which she was, and was taken to a safe place in the harbor, where she anchored; and, her one anchor being insufficient, the steamer held on to her with a line during the rest of the day and the succeeding night.

The trial court found that the schooner on both the occasions when she was rescued by the steamer was in great danger of going ashore, and of becoming a total loss; that the wind was blowing a gale, variously estimated, but probably 40 miles an hour; that the first aid given in the darkness of the night was attended with some danger to the steamer, in that she had to proceed between a railroad wharf and unlighted buoys, which were 150 or 200 feet away from the wharf; that the parting of the towline was caused by its friction against one of the buoys; and that, at the time when she was first rescued, the schooner was lying in water 18 feet deep amidships, and 12 feet near the stern, showing her to be almost ashore. The court also found that the second rescue was attended with danger to the members of the crew in conveying the towlines to the schooner. The steamer was not a salvage vessel, nor was she engaged in the towing business, but was a freight and passenger steamer of the value of from $45,000 to $55,000 and carried a master and crew of 37 men. She was about to leave the harbor on one of her regular voyages when the appeal for help came from the schooner, and in rendering the salvage service she delayed her voyage from 26 to 28 hours. The schooner was of the value of $1,500, and her cargo, including insurance and freight money, was of the value of $6,381.85. The court below awarded to the owner of the steamer one-half the value of the schooner, and one-third the value of the cargo.

Nathan H. Frank and Irving H. Frank, both of San Francisco, Cal., and J. W. Russell, of Hilo, Territory of Hawaii, for appellant.

W. O. Smith, L. J. Warren, and E. W. Sutton, all of Honolulu, Territory of Hawaii (S. H. Derby, of San Francisco, Cal., of counsel), for appellee.

Before GILBERT, MORROW, and HUNT, Circuit Judges.

GILBERT, Circuit Judge (after stating the facts as above).   [1] The appellant, the owner of the schooner, in his answer to the libel, to show that the steamer did not render efficient service, alleged that when the hawser broke, and the schooner's remaining anchor was cast to await another towline to be sent from the steamer, "although more than an hour elapsed, during which time the said Niihau had sufficient opportunity to give the Halcyon another and additional lines, yet the said Niihau made no effort whatsoever to supply any line, or to give to said Halcyon any assistance whatsoever until, when the claimant observed the Halcyon very close to the breakers and in danger of running ashore, he hoisted the signals for immediate assistance, and it was only after the hoisting of said signals that the Niihau rendered any further assistance," and the answer alleged it was the duty of

the steamer to have supplied other hawsers "immediately upon the breaking of the hawser during the original tow."

The service rendered by the steamer was clearly a salvage service, attended with some danger to the steamer and to the members of the crew who went in the boat to take lines to the schooner. The serious question in the case is whether or not the salvage award should be reduced by reason of the steamer's failure to stand by when the line parted, and her failure to take the schooner again in tow sooner than she did, and before the schooner reached the dangerous position in which she was when the second towage began. The captain of the steamer testified that, when the line parted, his reason for not returning and taking the schooner again in tow was that he supposed that those on board the schooner had cut his towline as an indication that they wished to be taken no further, and that this impression was confirmed by a signal which he saw given by a man on board the schooner, who extended his arms horizontally and then lowered them. That signal was probably a signal to the crew of the schooner to let go her anchor. When the line parted, a portion of it was left attached to the schooner, and the captain of the steamer saw the line hanging over the schooner's bow. He could not see how long that overhanging line was, but he could see that it extended into the water, and he should have known that it had not been severed by the crew of the schooner. He stood by when the line was drawn in and coiled, which was done within 10 minutes after it parted. He was asked:

"Q. Did you observe at that time that a big portion of it was gone? A. Not a big portion."

He testified that "somewhere about 20 fathoms" were gone. "I didn't measure it." Other witnesses testified that the piece of the line left on the schooner was 30 fathoms in length. According to the testimony of the captain of the steamer, the line parted at 6 o'clock, or possibly 15 minutes later. He testified that, 15 or 20 minutes after the line parted, he noticed that the schooner was drifting. At about half past 8, or a little later, he caused a line to again be taken to the schooner, to draw her out of the dangerous position into which she had drifted. He gave no satisfactory explanation of what he was doing in the meantime. Although repeatedly examined and cross-examined upon that feature of the case, he could only state that he was engaged in watching the schooner and in preparing to send a line to her. But when called upon to state the specific time devoted to preparation, he could account for no more than 40 minutes. A small portion of his testimony on that subject is the following:

"Q. Now, it was somewhere in the neighborhood of about two hours from the time that the towline parted until the Halcyon reached the beach. How do you account for the balance of that time? A. Well, the Halcyon was dragging in slowly; she was dragging during that time.
"Q. Yes, but what were you doing? A. We was—I explained that before. I was watching her.
"Q. So that while—you said that you sent her a line, say, about 10 minutes or so after you anchored at N-2? A. I didn't say that; I said we got our line ready.

"Q. How long did you remain at N-2 before the line started off to the Halcyon? A. So soon as everything was ready.

"Q. I'm asking you how long in point of time? A. When we sent the line to the Halcyon, that was about between 8 and half past 8.

"Q. Now, Captain, I'm not quite clear. You sent the Halcyon a line from N, your position at N-2, between 8 and half past 8. Is that right? A. Thereabouts.

"Q. You say the towline parted between 6 and half past 6? A. The towline parted a little after 6.

"Q. So that two hours elapsed from the time the towline parted until she— until you sent her a line from N-2? A. She was lying to an anchor there; there was no necessity of sending a line until she commenced to drag.

"Q. Then she was lying at anchor at what place? A. She had put her anchor down.

"Q. Wasn't she dragging at that time? A. Not right off.

"Q. How long a time did she remain without dragging? A. I said that before; in the neighborhood of 15 minutes before I noticed particularly that she was dragging."

Counsel for the appellee are able to account for the time only upon the theory that the captain of the steamer was mistaken as to the time when the line parted. They say the appellant's argument is based on Capt. Bruhn's erroneous testimony that the first line parted at 6 o'clock, and they point to other testimony which they say proves that it parted at 7 o'clock. We think it is true that the captain of the steamer was in error as to the time when the line parted. The decided weight of the testimony is that it parted at half past 6. The captain of the schooner, who was the only person who observed the time by a watch, said that it was 6:30, and he is substantially corroborated by several witnesses. The time when the line was taken aboard the schooner for the second towage is definitely fixed at 8:35, or a little later. It seems very clear that, within 30 minutes from the time when the captain of the steamer first noticed that the schooner was dragging on her anchor, he could have again taken her in tow. This is shown by the time it took him to get his line aboard the schooner for the first towage, at which time it was dark, so dark "you couldn't see your hand," as one of the officers of the steamer testified. The chief engineer of the steamer testified that, upon the first appeal for help, the captain came to him at 4 o'clock, "to get ready with the engines"; that the steamer was started between 4 and half past, and at half past 4 was actually engaged in towing the schooner. The second mate testified that at 4 o'clock they got word that the schooner was in distress, that the captain notified the engineers to get ready, and the engineers said they were ready, and that they heaved anchors and started. The testimony as to the length of time the steamer engaged in that first service of towing corroborates the testimony of the chief engineer that it must have been begun at or about 4:30 o'clock.

[2] We are not inclined to accept the theory of the appellant that the captain of the steamer, for the purpose of enhancing the degree of his salvage service, deliberately delayed starting the second time to the relief of the schooner. Nor do we think he was willfully negligent. But we are of the opinion that his delay was a negligent failure to render the prompt and timely service which the situation demanded, that it should be reckoned with in dealing with the appellee's demand for

a salvage award, and that the amount of salvage should be fixed upon the basis of service rendered as it would have been if, at the time when the schooner was perceived to be drifting from her anchorage after the line parted, the steamer had immediately gone to her assistance, and that the peril in which the schooner was at the time of her final rescue should not be taken into consideration. It is the theory and policy of the law of salvage to promote intrepidity, promptness, and skill in rescuing the imperiled vessel. Lack of skillful operation, with or without injurious results, may diminish the award; while, on the other hand, the skillfulness of the rescue may influence the award by increasing it. The Algitha (D. C.) 17 Fed. 551; The Katie Collins (D. C.) 21 Fed. 409; The Henry Steers, Jr. (D. C.) 110 Fed. 578. In The Cape Packet, 3 W. Rob. Adm. 122, Dr. Lushington said:

> "There is also another kind of negligence, the effect of which is to diminish the amount of salvage reward, not to take it entirely away. The extent of this diminution, I may further state, is not measured by the amount of loss or injury sustained, but is framed upon the principle of proportioning the diminution to the degree of negligence, not to the consequences."

We think that under the circumstances $2,000 would have been a fair award for the appellee's services.

The cause is remanded to the court below, with instructions to modify the decree as above indicated, awarding the appellee $2,000, without interest, and with costs on the appeal in favor of the appellant.