## THE GALLEGO.[1]

### MORGAN'S LOUISIANA & T. R. & S. S. Co. *v.* DE ARROTEGUI and others.

*(District Court, E. D. New York. March 8, 1887.)*

1. SALVAGE—STEAM-SHIPS—LOSS OF RUDDER—LEE SHORE—AWARD.
   The Spanish steam-ship Gallego, when off the Florida coast, lost her rudder and rudder-post. For two days she drifted, with a signal of distress set, in a direction that would shortly have carried her on a lee shore, various vessels passing her, but none offering her assistance. The steam-ship Lone Star, bound

[1] Reported by Edward G. Benedict, Esq., of the New York bar.

from Galveston to New York, finally came to her assistance. Four hawsers were passed from the Gallego's quarters to the bows of the Lone Star, by means of which the latter was enabled to steer the Gallego, hauling her stern from side to side, as occasion required. Abandoning for the time her voyage to New York, the Lone Star brought the Gallego safely to Havana. In doing so she encountered risks, and was actually damaged by collision with the Gallego, and in other ways, to the extent of $2,451.96. The Gallego and her cargo were worth $476,764. The Lone Star and her cargo were valued at $440,265. *Held*, that $25,000 should be awarded the Lone Star as salvage, besides the actual expense which she incurred.

2. ADMIRALTY—EVIDENCE—NOTARY'S CERTIFICATE TO PROTEST.

The official certificate of a notary proves the making of a protest, and what it contains. It is competent evidence in a court of admiralty, and the examination of the notary by commission, in order to prove the protest, is not necessary.

*Charles H. Tweed* and *R. D. Benedict*, for libelant.

*Evarts, Choate, & Beaman*, for respondents.

BENEDICT, J.   This is an action to recover salvage compensation for services rendered to the steam-ship Gallego by the steam-ship Lone Star. The facts proved leave no room to deny that on the occasion in question a salvage service was rendered the Gallego for which the libelants are entitled to salvage compensation. The substance of the controversy is in respect to the amount proper to be awarded. In determining this question, it will be as well to notice the considerations adverted to by the admiralty division of the high court of justice of England, in the recent case of *The Werra*, [unreported,] to which case I have been referred by the advocate for the claimant in this case. In opposition, therefore, to the very positive contention on behalf of the claimant that the value of the property saved is "the last element to be considered," I adopt the remark of the court in the case of *The Werra*, that "the first thing which one considers is the value of the property which has been saved," and proceed to consider the value of the steam-ship Gallego, her cargo and freight, at the time she was saved by the steamer Lone Star.

As to the value of the cargo and freight there is no controversy. It is put at $276,764. As to the steamer there is considerable difference among the witnesses called by the respective parties to express an opinion in regard to her value. The claimants have refrained from stating her value in their answer, have given no evidence to show at what value she stood on the owner's books, as was done in the case of *The Werra*, and have contented themselves with producing the testimony of witnesses who never examined the vessel. The failure of the claimants to produce any witness to her value who ever saw the vessel, when it was in their power so to do, leads me to believe that the value put upon her by the witnesses called for the libelants, who know the vessel, is nearer the truth. I therefore, for the purpose of this case, take the value of the Gallego herself to be $200,000, and the total value of the property saved is therefore the sum of $476,764.

Following still the order observed in the case of *The Werra*, I next consider the peril to which this property was exposed. The disaster which befell the Gallego was loss of her rudder and rudder-post. Her

hull remained sound, and her motive power was intact, but she was without a rudder, and, as her various efforts proved, was destitute of other means whereby to direct her course. When she met with this disaster she was off Jupiter light. The Florida coast was some 12 miles distant to the west, and Mantanillo shoal was about 40 miles distant on the other side. This fact of locality is important in determining the extent of her peril, and unquestionably the locality was dangerous for a vessel deprived of power to direct her course. It is true that she was in the Gulf stream, but the currents of the sea are far from reliable, as the recent experiences of the Wisconsin and of the City of Chicago seem to show.

On the day the rudder was lost an effort was made by the Gallego to steer by means of a boom and anchor. The effort failed, and three hawsers were lost in making it. On the next day a second effort was made to steer her by means of two booms lashed together. This effort also failed, and both booms and hawsers were lost. Signals were set, which, as the answer correctly states, were signals of distress. Two sailing vessels came to her, but were unable or unwilling to aid her. Four different steamers came in sight, and were signaled. Two passed without paying attention. A Spanish steamer passed near enough to be recognized, but did not stop. Another answered her signals, but passed on. Meanwhile she was drifting without ability to direct her course. Disabled as she was, she was sure to be carried somewhere by the winds and waves, but where could not be known. Her abandonment at sea, or stranding upon some shoal, was not only possible, but certain, unless some vessel should come to her aid. From noon of the 15th to midnight of the 17th she drifted about a hundred miles, and that in a direction that would have carried her ashore in 24 hours.

It has been contended that a lee shore would not be dangerous to the Gallego, because she was a propeller, and, with motive power intact, a propeller can, without a rudder, escape from a lee shore. The case of *The Alaska* is referred to as supporting this proposition. But whether the Gallego could be made to do in the current of the Gulf stream what the Alaska did where she was, is not known. Moreover, the ability of the Alaska to make a course without a rudder was to her master, as he says, a revelation. No such revelation came to the master of the Gallego, and his actions and signals afforded conclusive proof that he had no belief that he could make a course, situated as he was, and considered assistance a necessity for his ship.

At the trial the master and officers of the Gallego, in contradiction of their protest, declared that they never supposed the Gallego to be in any danger. It is easy after the event to deny fear; but, if it be true that this steamer was under command of a master unable to see any peril in the condition of his ship as she was when the Lone Star came to her aid, that circumstance, in my opinion, would enhance the peril of the ship. The acts of the master at the time speak louder than his subsequent words, and show knowledge that the position of his ship was one of peril. Of course, it can be said that, being sound save in

respect to her rudder, the Gallego, for a time more or less extended, as the chance of favorable winds and of being fallen in with by some other vessel not only willing but able to aid her might have favored, would have floated; but, such chance not favoring her, destruction in the end was to be expected, for she was upon the sea without the knowledge and ability necessary to enable her, unassisted, to reach a port of safety.

It was with her not a mere question of delay, as is sometimes contended when the screw is lost, and resource must be had to sails. Her difficulty was that although she had motive power she could not navigate because she could not control her course. Neither could she remain still. She was bound to be borne somewhere. If refused assistance by all vessels, as she had been by those that had passed her by, in all human probability she would be borne to destruction. From this position of peril she was relieved by the Lone Star, and by the aid of the Lone Star she was conducted in safety to the port desired by her master, and most advantageous to her. Of course, the existence of a chance of obtaining assistance is to be taken into consideration, but the fact that she might chance to meet a salvor does not justify the assertion that she was in no peril. The circumstances under which the Gallego was placed, and the risks to which she was subjected, in my opinion, made it the imperative duty of her master to induce the master of the Lone Star to furnish assistance; and the Lone Star, having successfully assisted her, is entitled to claim salvage as having rescued her from a position of great peril.

At this point, as well as any other, may be considered a question of evidence which arose out of the libelants offering in evidence the protest of the Gallego, to contradict the testimony of her master when he says that there was no danger. Against the admission of this protest in evidence strenuous objection is made. The objection, however, finally reduces itself to the contention that the protest is not admissible because a copy. The document purports to be certified by a notary, and to the certificate is attached a notary's seal. The seal of a notary is judicially taken notice of, he being an officer long recognized throughout the commercial world. In this instance the seal is an impression in ink, in the form of a notarial seal, stamped upon the paper. Such an impression is, in my opinion, a seal, and it authenticates the certificate to which it is attached. Says the court in *Orr* v. *Lacy*, 4 McLean, 247: "An impression on parchment or paper, with intent to·make a seal, is good at common law." We have, then, the official certificate of a notary that a protest in this form was made before him. Such a certificate, undisputed, proves the fact of the making of a protest, and what it contains. The document offered is more than a copy. When a marine protest is made before a notary, the notary enters in his notarial book the fact of a protest, and the reasons given for making the protest. A common form is: "By this public act be it known to all whom it does concern, * * * wherefore the said * * * protested, and I, the said notary, do by these presents publicly protest." The notary's book is never given out.

That is a record of the notary's office, made there for the benefit af all whom it may concern. The benefit of this record is secured to those concerned by issuing a transcript from the book, certified by the notary to be correct, and in no other way is the protest made available. The document here produced is such a transcript, and that it is competent evidence in a court of admiralty I do not doubt. Many such protests have been offered in evidence before me, and never before have I heard it contended that, to prove a marine protest in a court of admiralty, the notary must be examined upon a commission. The supreme court in *U. S.* v. *Percheman*, 7 Pet. 51, says: "We think that, on general principles of law, a copy given by a public officer, whose duty it is to keep the original, ought to be received in evidence."

It may be added that in this case it appears by the testimony of the master of the Gallego himself that he made a protest before this notary, and he himself took a certified transcript. That transcript the claimants do not produce, thereby making applicable to them the remarks of the court in the case of *The Emma*, 2 W. Rob. 315, where the failure to produce such a transcript was noticed by the court.

The protest being in evidence, there is little ground left for the position taken by the advocate of the claimants that the danger that the Gallego was in rests altogether upon suppositions, and the imagination of counsel.

Following still the order adopted in the case of *The Werra*, I next consider what sacrifices, what risks, and what expense did the Lone Star incur in assisting the Gallego. Here the value of the Lone Star, her cargo and freight, as well as her circumstances, are to be taken in consideration. As to the value of the cargo and freight, there is no dispute upon the evidence. It is $240,265. In regard to the value of the Lone Star herself, the opinions of the witnesses vary from $120,000 to $225,-000. Mr. Dimmick, who knows the vessel well, and examined her for the purpose of being enabled to form a more accurate opinion as to her value, states her value at $225,000, and I feel safe, therefore, in taking her value as stated in the libel. For the purpose of this case, the Lone Star will be valued at $200,000, making the total value of the property at risk the sum of $440,265. At the time the Gallego was fallen in with, the Lone Star was on one of her regular voyages, in a regular line running between Galveston and New York. She was due in New York on Friday, the twenty-first of October, whence she was to sail on the 23d. At the request of the master of the Gallego, she abandoned her voyage, and went with the Gallego to Havana, where she arrived on the 21st. The time actually occupied in reaching Havana was five days, and she lost three days more in reaching New York, her port of original destination. She missed, moreover, her sailing day at New York, and the cargo she would then have taken was taken by another vessel.

The character of the service the Lone Star was called on to perform was to steer the Gallego. This she made out to do by means of four nine-inch hawsers fastened to the Gallego's quarters, and bent to a chain cable attached to the bow of the Lone Star. In this way, both vessels being

kept in motion by their respective engines, the Lone Star, could haul the stern of the Gallego one side or the other, and thus direct her course. While the Gallego was being thus conducted to the port she desired to reach, the weather for much of the time was calm. On Sunday night, however, a gale was experienced, in which the nine-inch hawsers parted, and on Monday the vessels were in actual collision. While attempting to make fast again, the hawser parted a second time. On one occasion an effort was made to tow the Gallego astern of the Lone Star, but the effort failed, and not through want of skill. The course thus pursued by the Gallego was given her by the Lone Star, and the way was dangerous, being from Jupiter light to Havana. While proceeding on this way, the vessels were obliged, on one occasion, in order to ascertain their position, to bear up within five or six miles of a reef where vessels with rudder and motive power intact are sometimes stranded, and it is the opinion of some of the witnesses that the gale experienced must have caught the Gallego if the Lone Star had declined to assist her, and would have driven her ashore in spite of all efforts. This service involved risk to the Lone Star. Not only was she exposed to the risk of ordinary perils of the sea for eight days, but to this was added the risk of collision with the Gallego. That this is no imaginary peril appears from the evidence in this case, and from other cases which have been adjudged. See the case of *The Demetrius,* 2 Pritch. Adm. Dig. "Salvage Awards," 847.

But Havana was reached without any special peril of life, or any extraordinary hardship on the part of those on board the Lone Star. On making Havana, a tug came out, and the Gallego then attempted to enter the port by her aid. She found it impossible to accomplish this, and, after getting dangerously near to the breakers, she again resorted to the aid of the Lone Star. On this occasion an expedient unusual for vessels of this size was resorted to, for the Lone Star lashed the Gallego along-side, and in this way took her into the port of Havana, and there moored her in safety. In the rendition of this service the Lone Star was put to an actual expense of $2,451.96, to pay for damages to hull, loss of hawsers, etc.

Having now stated some of the facts from which I conclude that this is a case for a liberal reward, there remains only to fix the amount. This amount is determined with reference to the value of the property imperiled, the extent of the peril to which the property was exposed, and the sacrifices, risks, and losses encountered by the salving vessel. To these must be added the consideration that the object that the rule of the maritime law in respect to salvage is not so much compensation for work and labor performed; as to hold out to those who sail the seas a strong inducement to volunteer their aid to vessels in distress. The importance attached to this consideration by the English admiralty is shown by the remark of the court in deciding the case of *The Rio Lenia,* 24 Mitch. Mar. Reg. 628, to which I have alluded on a former occasion. In that case Sir ROBERT PHILLMORE says:

"It has been impressed on the minds of the court that there seems to be a growing dislike on the part of the owners of ships to allow their vessels to ren-

der assistance, even when no jeopardy of life is concerned. That must be met by a liberal allowance on the part of the court whose duty it is to consider all the circumstances of the case."

This remark derives emphasis from the fact proved in this case that four steamers in succession passed within sight of the Gallego's signals, and did not stop.

In view of all these considerations, I am of the opinion that it will be proper in this case to award the libelants a salvage award of $25,000, ·to which must be added $2,451.96, being the amount expended by the salvors, and the costs of this action. The apportionment of the salvage among the various persons entitled to share will be made at the time of entering the decree.