## THE ANN L. LOCKWOOD.[1]

### PEARCE v. THE ANN L. LOCKWOOD.

*(District Court, D. Delaware.   December 28, 1888.)*

**1. SALVAGE—DERELICT.**
   A vessel at least six miles from shore, submerged from midships to bow, her running rigging overboard and snarled fast, her boat gone, her cabin, fore-castle, and galley full of water, a distress flag set, and deserted by her crew, who had left no signs of an intention to return, and were not visible, is *prima facie* derelict and abandoned, though she was anchored, and her master was intending to return to save her, and had telegraphed for a wrecking vessel to assist him.

**2. SAME—TRESPASS.**
   The respondent, a strong, well-equipped vessel, found a vessel in distress, and abandoned by her crew, about six to ten miles from shore.   Respond-ent's master, discerning no signs of the crew, who were ashore at a life-sav-ing station partially hidden behind a small hillock, and there being no sign when the vessel was abandoned except a live dog, took her in tow.   During the following night the tow-lines parted in a gale, and the crew placed on the distressed vessel were forced to abandon her.   She was afterwards found adrift, and taken to port.   *Held*, that the respondent, having acted in good faith, with reasonable expectation of saving the vessel, was not a trespasser, or liable for the injury caused by the gale that compelled her abandonment.

In Admiralty.

Libel *in rem* by George B. Pearce, master of the schooner Carrie Hall Lister, against the schooner Ann L. Lockwood, for injury done the Lister by a gale, while in the possession of the Lockwood.

*Chas. C. Lister, Levi C. Bird,* and *Henry R. Edmunds,* for libelant.

[1] Reported by Marks Wilks Collet, of the Philadelphia bar.

*Alfred Driver* and *J. Warren Coulston*, for respondent.

WALES, J. The schooner Carrie Hall Lister, of 160 tons register, with a crew of four men all told, laden with 182,000 feet of lumber and laths above and below decks, at about 5 o'clock A. M. on the 2d of October, 1883, while on a voyage from Bowdoinham, Me., to New York, and when off Shinnecock light, Long Island, encountered a strong gale from the south-east, with a heavy sea, causing her to pitch and plunge so that her master was compelled to bear away towards shore. At 12 M. on the same day she lost her mainsail, main-boom, and gaff, the main-peak halyards were cut away, and, the wind working round more to the southerly, the deck load began to shift, breaking off her stanchions, and loosening the combings. At this time she began to fill, and at 2 P. M., being water-logged and soaked, her captain ran in to land until sundown. The kedge anchor was first let go, but, this failing to hold, the starboard anchor was got over with 30 fathoms of chain, and the vessel was stopped at 9 P. M. in 15 fathoms of water, and at from 5 to 7 miles from the Bellport life-saving station. The Lister was now submerged from midships to bow, and unmanageable. One-third of the deck load had been washed overboard, and the crew, without water or provisions, passed the night on deck until sunrise the next morning, when they all left in the yawl-boat for shore, leaving a signal of distress hoisted on the foremost back-stay, but without any notice of their intention to return, or of where they had gone. Upon approaching the beach, the surf being high, they anchored the boat on the bar, and signaled the life-saving crew for assistance, who came off in their surf-boat, and carried them to the station. The captain of the Lister immediately sent a telegram to New York, requesting the wrecking company to send a tug to tow the schooner to New York, and three hours afterwards received a reply that the steamer Rescue would be sent at once. In the mean time, while the crew of the Lister were at breakfast in the station, at about 9 o'clock, the schooner Lockwood sailed up to the Lister, and slipping her anchor, took her in tow, and sailed off in an easterly direction. As soon as the captain of the Lister saw, or was informed of this, he countermanded the order for the tug. The Lockwood subsequently abandoned the Lister at sea; and when the latter was afterwards found at Newport, R. I., into which port she had been taken by the United States revenue cutter, Dexter, she was materially damaged and despoiled, as specifically set forth in the libel; and it is for the damage and the consequent detention, together with the loss of the personal effects of the crew, amounting in all to $5,681.79, which occurred between the time the Lockwood wrongfully took the Lister away from her anchorage, and the finding of the vessel at Newport, that reparation is now sought. The libel alleges that the Lister was securely anchored, was in no immediate danger, that her master and crew had left her only temporarily for the purpose of getting provisions and of procuring assistance to tow her to New York, and that she was neither derelict nor abandoned. The Lockwood was therefore a trespasser, and not justified in interfering.

The evidence on the part of the respondents is substantially this: The Lockwood, a three-masted schooner, loaded with 500 tons of coal, was bound from Philadelphia to Boston, when she fell in with the Lister, in the condition already described, distant about 11 miles from land, the wind being north-west, with a heavy sea rolling from the south-east. A mate and two seamen were put on board the Lister. They found her port anchor lashed to a ring bolt, and the starboard anchor gone, the chain hanging out of the hawse-pipe, the end of which could be seen as the vessel rose with the sea; her running rigging was overboard, and snarled fast to the vessel, and towing along-side; her boat was gone; the deck load shifted; her cabin, forecastle, and galley full of water, and water in her hold; no lines or hawsers, and no provisions or water on board. With the exception of the main jib, all the sails were gone or useless. She was taken in tow as a water-logged, unmanageable wreck, abandoned and derelict. The master of the Lockwood had previously examined the sea and land, and saw no human being or craft in sight, excepting the fishing steamer Joseph Church, which had made towards the Lister with the intention of taking her in tow, as derelict, to the nearest port, but was anticipated by the Lockwood. Everything movable in the Lister's cabin was afloat, and the secretary in the captain's room broken open, from which the ship's papers were taken by the mate, and subsequently deposited in the custom-house at Boston, and from thence forwarded to Wilmington, in this district, where she was enrolled and licensed. Soon after the Lockwood had started with her tow, a second hawser was attached to the Lister, and the towing proceeded favorably until 7 o'clock P. M., when the wind canted, and came out from the north north-west up to the north, and blew a gale, with a heavy and rough sea. The night was very dark, and at 8 o'clock the towing hawsers, by reason of the vessel working in the sea-way, parted. At the same time the deck load on the Lister began to work, and, the lumber cutting the lanyards, one part of the deck load went overboard. The Lister then righted over on the starboard side, and the mainmast fell forward. The mate and the two sailors, who had remained on the Lister up to this time, fearing that she would turn bottom up, left to save their lives, and drifted about in the storm and darkness until 3 o'clock the next morning, when they were taken aboard the Lockwood, which, after the Lister had broken loose, was sailed by the wind, and tacked for several hours in order to rescue the men. The men refused to go on the Lister again, and the Lockwood, seeing nothing of her, kept off on her course to Boston. When the hawsers parted, the Lister was between Montauk and Block Island. The Lockwood had her foresail and jib blown away during the gale. On the 4th of October, at 1 P. M., the captain of the Rose Brothers, a small schooner of 19 tons, of Block Island, seeing a wrecked vessel adrift, about 20 miles distant, which afterwards proved to be the Lister, went to her relief, and after several unavailing attempts finally succeeded in boarding her, and making a hawser fast to her, just before dark, intending to tow her into Vineyard Harbor, or Newport. Four of the crew of the Rose Brothers remained on

the Lister while she was being towed, until the hawser parted, not long after dark. The Rose Brothers laid by the Lister all night, and the next morning took her in tow again, about 9 A. M., when the United States revenue cutter, Dexter, appeared, and, taking the Lister in tow, carried her into Newport, arriving there at 7 or 8 o'clock in the evening of the same day. The owner of the Lister settled with the owners of the Rose Brothers, paying them $600 for salvage. The Dexter charged nothing, save for fuel and oil.

Capt. Monsell, of the life-saving station, and the captain of the Church both agree in thinking that the Lister was at anchor when the Lockwood first approached her, because her head was kept to the wind, which it would not have done, if she had been adrift. Capt. Monsell also estimates her distance from land to have been from eight to ten miles. Capt. Gabrielson, of the Dexter, and Wrecking Master Waters, both say that they would have taken the Lister in tow, under the same circumstances, as an abandoned vessel; the former qualifying his opinion by saying that he should have first gone to the life-saving station, had he known one to be near, for information. The captain of the Church was within a few miles of the land when he first sighted the Lister, and saw no one on shore. The life-saving station is about 100 yards from the beach, and somewhat concealed by a small hillock. The men from the Lockwood found nothing on the Lister to show how long she had been deserted by her crew, excepting a live dog.

In the course of the argument, much reliance was placed by the libelant's proctors on the evidence of the Lister being at anchor on the morning of the 3d, and on the proved intention of her master to return and endeavor to save her, to take her out of the category of derelict vessels. The question of her being anchored is not wholly free from doubt, but, conceding the fact that she was, yet, in her then condition, being partly under water and unmanageable, in the open sea, at the distance of eight or ten miles from shore, and deserted by her crew, she was, *prima facie,* derelict and abandoned. The intention of her master to procure assistance to take her into port might have affected the amount of salvage to be awarded to the Lockwood, had the latter succeeded in the attempt to reach Newport with her in tow; but such intention was unknown to the captain of the Lockwood, who could only judge of the necessity for his interference from what he saw before and around him, viz., a helpless wreck, sure to be lost, soon or late, by ocean storms, if allowed to remain where she was, without aid. The tempestuous weather of the day before had nearly destroyed her, and the captain of the Church says it looked on the morning of the 3d as if there would be plenty of wind before night,—a prediction that was fully verified. The life-saving station was not in sight, and there is no evidence that its exact location was known to the Lockwood. The two vessels were so far from land that persons on shore could not be seen with the naked eye, and Capt. Monsell, with the aid of a glass, was unable to discern the movements of the men who boarded the Lister. That there was considerable apprehension among the crew of the Lister that she was in some danger, if not in im-

mediate peril of being lost, is evident from her master's answer to the question:

"Did you intend to come back to the vessel? *Answer.* That is the reason we did not take our clothes. Mr. Kirk said that morning, before we started to go ashore, all he cared about was to get his foot upon dry land. I said to him. 'Look here, if you don't intend to come back to this vessel, we might as well stay while we are here;' so he said he would come back if I wanted to come. He said he didn't know I wanted to come back. I told him of course I wanted to go back. I didn't intend to throw away the vessel if I could save it."

He admits that it was impossible for himself and crew, without additional assistance, to save the Lister; and two disinterested witnesses, Capts. Gabrielson and Waters, testify that a vessel in her condition, even at anchor, in the open sea, is never safe,—apart from becoming a dangerous obstacle to navigation.

There is some vagueness about the definition of "derelict," when applied to vessels abandoned at sea, but the general rule is that a vessel which is abandoned by her crew, without any purpose on their part of returning to the ship, or any hope of recovering it by their own exertions, comes strictly within the definition. 2 Pars. Shipp. & Adm. 288. It has also been held that, if a ship be left, though not derelict in a technical sense, one who in good faith takes possession as salvor is not a trespasser, but has his reasonable claim for salvage, according to the good he actually does. Id. 291. And the same doctrines have been recognized by the admiralty courts of the United States. *The Senator,* 1 Brown, Adm. 372; *The John Gilpin,* Olcott, 80; *The Island City,* 1 Black, 121; *The Grace Brown,* 2 Hughes, (U. S.) 112; *The Laura,* 14 Wall. 336; *The Boston,* 1 Sum. 336. Perhaps the law on this subject is nowhere more clearly and concisely stated than in the case of *The Bee,* 1 Ware, 340, where the court says:

"But when the owner, or the master and crew, who represent him, leave a vessel temporarily, without any intention of final abandonment, but with the intent to return and resume the possession, she is not considered as a derelict, nor is the right of possession lost by such temporary absence for the purpose of obtaining assistance, although no individual may be remaining on board for the purpose of retaining the possession. Property is not, in the sense of the law, derelict, and the possession left vacant for the finder, until the *spes recuperandi* is gone and the *animus revertendi* is finally given up. *The Aquila,* 1 C. Rob. 41. But when a man finds property thus temporarily left to the mercy of the elements, whether from necessity or any other cause, though not finally abandoned and legally derelict, and he takes possession of it with the *bona fide* intention of saving it for the owner, he will not be treated as a trespasser; on the contrary, if by his exertions he contributes materially to the preservation of the property, he will entitle himself to a remuneration according to the merits of his service as a salvor."

The respondents, finding the Lister in distress, and without any one on board, had just grounds for believing her abandoned, and lawfully took possession of her as salvors, and, had they succeeded in taking her into port, would have been entitled to salvage compensation. The honesty of their motive must be judged by the situation and condition of

the Lister as they saw her on the morning of the 3d, and by the promptness, diligence, care, and ability with which they undertook the work of salvage. The Lockwood was a strong and well-equipped vessel, and in all probability would have succeeded in saving the Lister, if the storm of the ensuing night had not intervened, as is evident from the fact that the towing progressed favorably for several hours before the hawsers parted, and the Lockwood was compelled by stress of weather to seek her own safety, after the loss of some of her sails, and the exposure of her mate and the two seamen to serious personal danger. To hold the respondents to be trespassers under these circumstances might establish a dangerous precedent, and, should such a rule become generally prevalent, it would prevent sea-faring men in the future from making any effort to rescue distressed vessels, and thus contravene the hitherto settled policy of the law, which has always encouraged salvage services by giving to them the most ample rewards. The penalty of total failure in endeavoring to render a salvage service is to forfeit all compensation for work and labor, for risk of life and property, and for detention; and this has been considered sufficient to deter strangers from interfering to save property at sea, unless they believed their interference warranted, and that they would be able to render substantial aid. To increase this penalty by adding to it the punishment of trespassers, in a case like the present one, where the act complained of has been done in good faith, and was begun with reasonable expectation of success, would not be consistent with law or good policy.

It is unnecessary to consider the defenses of laches on the part of the libelant in bringing his suit, and of want of jurisdiction. A decree will be entered dismissing the libel, with costs.