THE HENRY STEERS, JR.

THE SCOW NO. 46.

THE TWO BROTHERS.

(District Court, E. D. New York. June 20, 1901.)

1. SALVAGE—SKILL AND CARE REQUIRED OF SALVOR.
   While a salvor should exercise the skill and care that a man of ordinary prudence and capacity in the same business would be expected to use, yet in case of necessity a person without ordinary nautical skill may undertake a rescue on the sea, not assuming a knowledge which he does not have, but using in good faith such ability as he possesses.

2. SALVAGE—COMPENSATION—NEGLIGENCE OR LACK OF SKILL.
   A salvor may be found guilty of misconduct, or gross negligence tantamount thereto, which may result in forfeiture of the claim for salvage; and lack of skillful operation, with or without injurious results, may diminish the award, while the presence of such skill may increase it.

3. SAME—INJURY TO SALVED VESSEL—DAMAGES.
   Specific negligence proximately resulting in distinguishable injury to the vessel may be used in an action for salvage either to diminish or defeat compensation; and in an action by the owners of the property, when culpable negligence is established against the salvor, resulting in injury, damages therefor may be recovered.

4. SAME—GROUNDS FOR COMPENSATION—BENEFITS.
   Compensation may not be given unless a benefit is conferred by the saving of property, but any person whose aid has tended to this result may be compensated, although he was compelled by prudence or necessity to discontinue his assistance and leave the final rescue to others.

5. SAME—REQUEST FOR AID.
   A request for aid by a vessel in distress does not authorize compensation therefor unless the aid rendered was helpful in the final saving of property.

In Admiralty.  Suit to recover for salvage services, and cross libel for damages.

Henry W. Goodrich, for White and others.
Charles Thaddeus Terry, for the Henry Steers, Jr.
Foley, Wray & Taylor, for scow No. 46.

THOMAS, District Judge.  This action is for salvage services. The tug Henry Steers, Jr., is 100 feet long, and her draft is 11½ feet. At about 4 o'clock in the afternoon of November 21, 1900, she, with mud scow No. 46 in tow, was bound for the North river.  When between the black buoy and the bell buoy in Coney Island channel, the breaking of the tug's propeller left her without means of propulsion.  This disablement was opposite a long stretch of sandy shore known as "Coney Island Beach," and probably within a thousand feet of the same.  The wind was from the southwest, blowing towards the beach with a velocity which shortly approximated 60 miles per hour, and a strong flood tide, the precise set of which is in dispute.  In such situation the tug was in danger of finally going upon the beach, and in that case she would have received some injury.  To guard against this result the Steers had certain resources. She could have anchored, being equipped for this purpose with two anchors, one of 350 pounds, and one of 450 pounds, together with lines and chains.  She was near and in the sight of the usual course of outgoing and incoming craft bound to and from the city of New York, and had frequent opportunity of obtaining adequate aid.  This is a valuable, but not conclusive, consideration.  The Monticello (D. C.) 81 Fed. 211, 214.  The Steers appreciated that, from the nature of her condition, removal by the aid of another steam vessel would be ultimately necessary, and that her unsafe proximity to the beach demanded early assistance.  She gave a signal of distress, to which the Two Brothers responded.  This vessel was a steam lighter, 120 feet in length, with a draft of 10 feet and 2 inches aft and 2½ feet forward when light; she was used to carry offal from the city to Barren Island, from which latter place she was returning.  The mate of the Steers requested the Two Brothers to aid him, which the latter attempted to do; and the captain of the Steers called out to the tug Ariosa, who had slowed down in view of the Steers' situation, that he had engaged the Two Brothers, and that he would not need the Ariosa.  The tug Charles Runyon, with a tow, also was in sight.  After taking the Steers and her scow in tow on a hawser the Two Brothers conducted them with difficulty, owing to an increasing wind, and later to the consumption of fresh water, and the necessary use of salt water, and after several hours, and after the night had come on, hauled them alongside the westerly breakwater of the Erie Basin.  There the Steers took the bottom.  The Two Brothers could not drag her along to the gap of the Erie Basin, as her master states that he intended to do, but, having received injury herself, such master threw off the hawser, passed a line to one of the Steers' crew on the dock, and departed, and no more was heard of him.  The Steers, thus abandoned where the incoming and receding waves dashed her against

the breakwater and ground her bottom on the hard bottom, was after an hour or more of violent effort by her crew brought into Gowanus creek. The injuries received at the breakwater by the Steers were about $2,850; the demurrage value by reason of repairs was $500; the scow was injured to an extent not stated in value; and the Two Brothers was injured to the extent of $1,200, and the demurrage value was about $500. The alleged reason for leaving the Steers at the breakwater was the lack of fresh water. She had been using salt water for at least half the service, and claims that, through sheer lack of power from this cause, she was unable to continue her service. She had filled her tank at Barren Island, and at the time she took the Steers in tow had a good supply of water, which was exhausted by the time she reached Ft. Hamilton.

The state of facts to this point is this: A steam lighter undertook to save a tug, with her tow, at the latter's request, from going ashore on a sandy beach, where some injury would be expectable, and, after carrying her forward for several hours, landed her on the same shore, against a dangerous breakwater, where she was ground and injured upon a hard bottom, and there left her. The object of the service was to save the vessels from the sandy beach, yet the salving tug hauled them upon the same shore, and practically beached them. The Two Brothers undertook to make the Steers' situation better by keeping her from shore. She made her situation as bad as or worse than it was at the outstart, by casting her on the same shore several miles away in the dark, in a locality notoriously dangerous during the prevalence of westerly winds, and condemned as such by the admiralty court. Phœnix Towing & Transportation Co. v. City of New York (D. C.) 60 Fed. 1019; Hastorf v. The Governor (D. C.) 77 Fed. 1000. This is an action for salvage, and is based upon benefits alleged to have been rendered. What good did the Two Brothers to the Steers and her tow? To take in broad daylight from proximity to a sandy shore, in the full view and presumable assistance of the tugs, and drag her in the night to the same shore, and leave her to be dashed by a furious wind against a breakwater, to be ground on the bottom by the waves, was not a benefit. To save from a sandy shore, drag on a harder bottom, and then abandon, presumptively saves nothing. By reason of her total failure, the Two Brothers saved nothing, and can be awarded nothing. The Ann L. Lockwood (D. C.) 37 Fed. 233, 238. She did not bring the Steers and her tow into greater comparative safety. If anything, she brought her into greater comparative danger. In view of this conclusion, the respondents ask from the libelants compensation for the injuries to the Steers from her delivery and abandonment at the breakwater. It does not logically follow that such damages should be given. The salvage award is denied, because, in view of the whole service, the Two Brothers rendered no net benefit, having placed and abandoned the tug and her tow in a place more dangerous than that where she found her. But, if the court were inclined to conclude that this was such culpable negligence as should render the Two Brothers liable for the consequent

injuries, there is another part of the history that should at least neutralize such consideration. At Ft. Hamilton, where the Two Brothers found her water substantially exhausted, her master proposed to dock the vessels at a wharf; but the master of the Steers refused to be moored there, and insisted upon being carried across the bay to the anchorage at Tompkinsville, Staten Island. This was rendered difficult by the direction of the wind, and the master of the salving vessel explained that he could not deliver his charge at that point, by reason of the necessary use of salt water for his boilers, but acceded to the wish of the tug's master to proceed in expected aid from vessels seen to be approaching, but such vessels were found unable to assist. Had the tug and scow been moored at Ft. Hamilton, as they might have been with reasonable safety, a salvage award would have been due; and such an award would be allowed even now, if the court were not constrained to consider the salving vessel's later conduct, which effected injury more than counterbalancing the value of the service rendered. That is, the service is considered as a whole, and the whole service conferred no benefit. It is urged further that the Two Brothers negligently undertook the rescue, inasmuch as she had not the capacity to succeed. By such a rule a vessel would not venture to aid another in distress unless she was sure of herself. The Two Brothers had good power. She had water enough for usual purposes. But the task became more difficult by reason of the increasing violence of the wind, and the exhaustion of the water stored for her boiler.

In view of the earnest and helpful briefs submitted by the parties, it is proper that the law applicable to the questions discussed should be stated. Two questions by the conclusions above reached have been answered in the negative, and to such questions the law is applicable. The first question is this: Is an award for salvage service due a steam lighter who upon request of a disabled tug with a scow in tow undertakes to prevent the same from going ashore on a sandy beach, where some injury would be expectable, and, after towing for several hours, drags and leaves, after night has set in, the crippled vessels on the same shore, against a breakwater, dangerous during the prevailing wind, where they are injured seriously by the violent action of the water, and where they are comparatively in as great or greater danger than in their first position? The second question is this: Are the owners of the vessels attempted to be salved entitled to recover from the steam lighter compensation for the injuries received in the manner stated?

What care or skill should a person attempting a salvage service exercise? The rule of general application in cases of salvage is that he should use the care and skill that would be exercised by persons of ordinary skill and prudence in the business undertaken. The Mulhouse, 17 Fed. Cas. 962 (No. 9,909); The Neptune, 1 W. Rob. Adm. 297; The Cape Packet, 3 W. Rob. Adm. 122. In the last case Dr. Lushington said:

"I do not mean to say that they must be finished navigators; but they must possess and exercise such a degree of prudence and skill as persons in their condition ordinarily do possess, and may fairly be expected to display."

A person without knowledge of navigation might not be justified in undertaking the rescue of a ship, where nautical skill was required, if other persons with the adequate skill were at hand. It was for this reason that in The Dygden, 1 Notes of Cases, 116, Dr. Lushington refused salvage award to fishermen who undertook to handle a ship in distress, and, as found by the Trinity masters, took erroneous steps from the beginning to the end. It must be noticed that the fishermen put themselves forward to extricate a ship from a critical peril, where a knowledge of seamanship not possessed by them was demanded, and there were others ready to render the needed aid, that did have the proper skill and resources. But in the opinion it was said:

"When persons offer their services to vessels in distress, and there are no other individuals on the spot capable of rendering more efficient assistance, this court must look with considerable indulgence at their efforts, because, being the only aid that can be procured, and offered in a state of great exigency, every allowance must be made if they are not possessed of adequate knowledge to perform the duty they had undertaken. But different considerations will apply to the conduct of individuals who assume the character of salvors, when there are persons competent to discharge those duties."

Care was taken to suggest that inexpert persons were not precluded unconditionally from attempting rescues. The fishermen took charge of the ship, and assumed unpossessed knowledge, when others near by actually had and were willing to use such knowledge. Whenever there is a signal of distress upon the sea, anybody in position to do so should respond and render all possible aid, but the aid should be tendered in its true character; and one unskilled should not assume a capacity not possessed and step in before those skilled in a necessary maneuver, and ready to execute it. It would be a hurtful rule that a person willing to save an imperiled ship, and men crying to him for aid, must fear to give it lest he be mulcted in damages, or go entirely unrecompensed, for lack of proper skill. Nevertheless, where skill and prudence are required, the failure to use them, under a proper state of facts, may be deemed negligent. Negligence thus established may be used by the court in two ways. One consideration present in fixing a salvage reward relates to the promotion of intrepidity, skill, and promptness in rescuing imperiled property. Hence the skillfulness of the rescue influences the award by increasing it. The Sandringham, 10 Fed. 556, 573, 575, 577; The Blackwall, 10 Wall. 1, 14, 19 L. Ed. 870. When these qualities save the ship and cargo with slight loss, a higher award is due. The Sandringham (D. C.) 10 Fed. 556. So injury to the salved vessel during the service may diminish the award, although no negligence be found. The Haxby, 28 C. C. A. 33, 83 Fed. 715. But the results of the salvor's negligence may be offset specifically against what would be otherwise due. So the salvors must respond in a direct action for negligence resulting in injury to the salved property. Negligence might occur under two prominent conditions: First, while the salving vessel is herself imperiled or is acting under peculiar difficulties, in rescuing another vessel from danger; second, in the disposition of the salved vessel after the immediate peril of rescuing her is at an end. It should be borne in

mind that negligence will be ascribed more reluctantly to a salving vessel when alleged negligent acts or omissions must be looked for in the very midst of the peril in which either or both vessels are involved. But even in that case negligence may diminish or defeat a recovery, as was held in The Dygden, 1 Notes of Cases, 116; The Neptune, 1 W. Rob. Adm. 297. It is not improper to state in this connection that such condemnation for negligence should be made sparingly when the peril is great and the demand for instant aid is imperative, and especially when it is rendered under conditions of danger by one whose assistance is needed, or where such assistance is asked. In such case fear of legal consequences should not interpose to impair the vigor of action. In short, the law should not scrutinize too narrowly services rendered to persons or property exposed to destruction by one asked or welcomed to share the jeopardy and give relief therefrom, when such person acts in good faith. It is very well understood that even now the anticipation of reward does not tempt from their courses certain classes of vessels to save property exposed to destruction, and a rule that would hold scrutinizingly a salving vessel to the exhibition of high skill would increase a growing aversion to salvage services on the part of those best able to render them. But negligence may occur in the disposition of the vessel after she has been secured from the danger, or while ordinary towage services are rendered her. Although a vessel be saved from imminent danger, the salvor's duty arises to place her in such safe position as opportunity and the exercise of ordinary care will permit. An unreasonable termination of the service by either party is not encouraged. The Veendam (D. C.) 46 Fed. 489, 495. If in the course of ordinary towage, anchorage, or dockage, the salved vessel meets with disaster through the negligence of the salving vessel, there is no adequate reason for exempting the offending vessel from accountability therefor, but what would constitute negligence would depend upon the facts present. If the injury to the salved vessel is the proximate result of the salvor's culpable negligence, there is no reason precluding its ascertainment and reduction to judgment. Whether the salvor was negligent and was the proximate cause of the injury must be established. But, when these facts are found against the salvor, there is no occasion for exempting him from liability. It is considered that the true rule is that negligence or skill, irrespective of resulting damage, must always influence the award; and, where the salvor's act or omission amounts to culpable negligence proximately resulting in separable and distinguishable injury to the property, then the salvage compensation may be diminished pro tanto or totally extinguished; and if the owners of the property injured ask in suitable form a recovery may be allowed, if the salvor's negligence proximately caused the damage. In Serviss v. Ferguson, 28 C. C. A. 327, 84 Fed. 202, the circuit court of appeals of this circuit decided that salvors were liable in damages in an action against them by the owners of a vessel picked up adrift without persons aboard, and thereafter so negligently placed in a slip that she was sunk and rendered worthless. The decree was for the value of the scow, less one-third thereof deducted for salvage compensation. The action was specifically for damages for the salvor's negli-

gence. Usually the question has arisen in fixing the award, which has been resisted upon the ground that the salvor's negligence or misconduct should defeat any recovery. Here the action was based upon the negligence, and damages lessened by the value of the salvage service given. In The Neptune, 1 W. Rob. Adm. 297, the court dismissed the salvage suit on account of the negligent handling of the ship. This amounted to a holding that either no benefit was conferred, or the benefit was wholly offset by the results of the negligence. In The Duke of Manchester, 2 W. Rob. Adm. 471, the claim of the alleged salvors was dismissed and they were condemned for the costs of the proceedings upon the ground that by their own misconduct they had run the vessel into difficulty and danger by towing her aground upon the Sandwich Flats. In the course of the opinion Dr. Lushington said:

"Salvors may be curtailed or even deprived altogether of their salvage remuneration through error, misconduct, or want of skill and capacity in the performance of a salvage service. Even where essential services have been rendered to a vessel, the subsequent misconduct of the salvor may not only diminish the amount of his reward, but his entire claim may be forfeited. This doctrine was distinctly laid down by Lord Stowell in the case of The Medina, which was cited by the queen's advocate; and in the case of The Neptune, 1 W. Rob. Adm. 297, which came before me, and in which I was assisted by two gentlemen of the Trinity board, I myself acted upon this doctrine, and declined to give any salvage at all, the Trinity masters having pronounced that the asserted salvors had been guilty of gross negligence, if not of willful carelessness, in allowing the anchor to be let go, and in keeping the course of the ship to the north, when they should have gone to the south."

In The Cape Packet, 3 W. Rob. Adm. 122, it appeared that the Cape Packet had suffered damage from tempestuous weather, and had lost nine of her crew overboard, when she was, at the request of her master, taken in charge by the master and crew of the Rose, who undertook to carry her into Dartmouth. In making for that harbor the salved vessel was steered to the northward of the Eastern Blackstone Rock, and, on attempting to pass between the rock and the mainland, struck the rock, and, beating violently, was damaged to the extent of £500. It was urged that this negligence entailed forfeiture of the salvage reward. Dr. Lushington stated in his opinion:

"I need scarcely point out to you that, where the neglect or the misconduct is willful, it entails an entire forfeiture of the whole claim to salvage remuneration. This is not attributed to the salvors upon the present occasion. There may again be instances of such gross negligence, independent of any willful inattention, as would debar all claim for salvage recompense. * * * There is also another kind of negligence, the effect of which is to diminish the amount of salvage reward, not to take it entirely away. The extent of this diminution, I may further state, is not measured by the amount of loss or injury sustained, but is framed upon the principle of proportioning the diminution to the degree of negligence, not to the consequences."

After submitting the question of negligence to the Trinity masters, and receiving their reply, this conclusion was stated:

"Having considered in my own mind what I should have awarded in this case if there had been no misconduct on the part of the salvors, and having made what I consider a proper deduction therefrom in proportion to that misconduct, I shall award the sum of six hundred pounds only."

It has been urged in the action at bar that the words used by Dr. Lushington, "The extent of this diminution, I may further state, is not measured by the amount of loss or injury sustained, but is framed upon the principle of proportioning the diminution to the degree of negligence, not to the consequences," preclude the court from determining the damages resulting approximately from the negligence, but that in some way the detrimental influence of the negligence is to be determined independently of the harm wrought by it. Such was not the holding of the circuit court of appeals in Serviss v. Ferguson, nor is such an indefinable mental process within the possibility of practical application. In The Cape Packet it appears that the judge considered what he would have given had it not been for the misconduct of the salvors; that he had made what he considered a proper deduction therefrom for this misconduct, and thereupon awarded the sum stated. It might very well be that in a certain instance the court could not distinguish the specific damages, but would be obliged to make some more definite general estimate of the influence of the salvor's negligence or misconduct. In such a case the court proceeds upon the general principle of equity, and makes the best ascertainment possible. It should be observed that, in the case last cited there was no cross claim against the salvor, so, that it became merely a question of considering the influence of the salvor's negligence upon the amount of the award.

In The Algitha (D. C.) 17 Fed. 551, it was concluded, where a disabled steamer made signals of distress, which were observed by another steamer, which took her in tow, and, after towing her 12 hours, voluntarily cast off the hawser, without communication with her and under no stress of weather, and left her in no better position in any respect than when she found her, that the vessel attempting the labor was not entitled to compensation either for salvage or towage service. The learned judge stated:

"The conduct of Capt. Nickerson, upon observing the signals of distress, in going out of his course, and in lying by the Algitha during the night, evinced a highly commendable spirit, and it is with hesitation that I deny all compensation for their delay, and for the twelve hours' towing; but as the Algitha, without any stress of weather, was left by him as helpless, and in at least as unfavorable a position, as where he found her, if not in a worse one, and as he abandoned her without any communication or consultation with her master, and as I find that the contract, regarded simply as a towage contract, was not performed, I do not think it is a case in which there should be any recovery. Services to vessels in distress should be encouraged, but not such as voluntarily leave the disabled vessel in the same plight."

In the opinion there is language peculiarly appropriate to the present case:

"It is apparent that there is in the case no element of a salvage service. The disabled vessel was not taken to a place of greater safety, but rather the contrary, nor was she left where her chance of meeting another steamer was better, but rather worse; and the distance accomplished, although in the desired direction, was insignificant."

In The Katie Collins (D. C.) 21 Fed. 409, it was decided that where salvors, having the management of the business, fail to get a stranded vessel afloat at the first high water at which she might have been floated had they employed the proper means, they must be considered

as having failed in point of skill and energy, and must suffer the just and legal consequences of such failure, notwithstanding they may have saved the vessel and cargo. Wells, J., said:

"If, in consequence of want of skill in sounding out channels, carrying out anchors, or navigating the vessel, or from any other omission of proper care or skill, the salvors incur unnecessary delay in extricating the vessel from its perilous situation, or get it ashore a second time, the salvage ought to be reduced in proportion to the degree of negligence or want of skill; and, when the negligence is gross or willful, it should be wholly forfeited. Marv. Wreck. & Salv. §§ 106, 108, 219; The Blackwall, 10 Wall. 14, 19 L. Ed. 870."

In The Mulhouse, 17 Fed. Cas. 962 (No. 9,909), it was held that slight negligence in taking care of the property saved diminishes the amount of salvage; gross negligence works a total denial or forfeiture of salvage. An indispensable element of salvage compensation is that the service shall be to some degree beneficial. That is, even if the effort of the salvor was not the sole cause of the rescue of the endangered vessel, it must have contributed to that result. A beneficial service may be rendered by one person, although the final rescue be due to the efforts of another. The Joseph C. Griggs, 1 Ben. 81, Fed. Cas. No. 6,640. So merely towing a disabled vessel on her course and bringing her nearer thereto, and thereupon necessarily leaving her, may justify compensation. The Camellia, 9 Prob. Div. 27. The saving of property is the most important consideration. The Gallego (D. C.) 30 Fed. 271; The Huntsville, 12 Fed. Cas. 996 (No. 6,916). In the case last cited it was held that a tug which floated a burning vessel and towed her to a place where other people put out the fire rendered a meritorious service. In fact, it is not unusual to make an award to the first set of salvors, where the final act is done by a second set. Muntz v. A Raft of Timber (C. C.) 15 Fed. 555; The Melpomene, 29 Law T. (N. S.) 405; The Neptune, 1 W. Rob. Adm. 297. But there must be something done by the salvors which as a whole amounts to a saving of property, or to assistance in the saving of property. It has been already held that the libelants in the case at bar effected no such result, and on that account salvage compensation is denied them. But the libelants are understood to urge that, even if no benefit was conferred, libelants are entitled to compensation because the service was requested by the tug. This would introduce into the law of salvage this principle: that a request for aid by a vessel in distress is in itself tantamount to salvage service, if such service be undertaken, whether the result be beneficial or not. The suggestion seems to find encouragement in the holding in The Melpomene, 29 Law T. (N. S.) 405. There it was decided that where a vessel makes a signal of distress, and another vessel responds to the call and attempts the relief, and gives such aid as she is able, but is prevented by accident from making her services as effectual as she intended them to be, without blame attaching to her, a court of admiralty will not allow her to go entirely unrewarded, but for the interests of commerce and navigation, and as an encouragement to perform salvage services, will give some reward, if the property is salved by other means. A careful reading of the case indicates that the salving vessel did actually confer some benefit, although it fell short of what was desirable. Sir R. Phillimore,

who made the holding in this case, expressed similar views in The Aztecs, 21 Law T. (N. S.) 797, where it was held that where salvors enter into an agreement to take a disabled vessel into harbor for a specified sum, and do all in their power to perform their engagement, but, in consequence of an adverse change of wind, fail to fulfill it, they are nevertheless entitled to salvage reward. It is obvious that a beneficial service was rendered, for in the opinion it is stated:

"It has not been contended before me, as I have already observed, that no salvage service was performed by the smacksmen, but that, inasmuch as the conditions of the agreement had not been fulfilled, they were disentitled to all salvage remuneration. It was also, however, argued, though I think with less confidence, that the salvors were disentitled to reward because their efforts had been unsuccessful; and the case of The Edward Hawkins, 1 Lush. 517, was mainly relied upon. * * * The main facts of that case were that the salvors left the vessel 'in a position of extreme peril,' from which she was saved by her own exertions. In this case it is admitted that the salvors did their utmost, and did not leave the ship in a position of peril without the consent of her master, or without having rendered certain services."

This question is of sufficient importance to justify a somewhat extended reference to The Camellia, 9 Prob. Div. 27. There a salvage award was given, inasmuch as the salvor brought a vessel in distress several miles nearer her proper course, and towed her 85 miles on her course, thereby bringing her into greater comparative safety, when the hawser broke, and, owing to prudence on her part, the salving vessel ceased her aid. The opinion states:

"Several cases were cited in support of the defendants' contention that the plaintiffs were entitled to nothing. There can be no doubt that services, however meritorious, which do not in any way contribute to the ultimate safety of the ship, are not entitled to salvage reward. Such was the case of The Edward Hawkins, 1 Lush. 515. There the vessel taken in tow was, after the parting of the hawser, driven away by a gale towards a dangerous coast, from which she was saved by her own anchors. The towing in no way assisted her, and therefore no salvage was earned. On the other hand, in The E. U., 1 Spinks, 63, Dr. Lushington puts the case of a vessel in a disabled state being brought on its way and then abandoned by the salvors in consequence of tempestuous weather or other circumstances, and afterwards being saved by other salvors, and he says 'that it is by no means to be laid down as clear law that the original salvors are not entitled to some reward.' And in The Killeena, 6 Prob. Div. 193, Sir R. Phillimore says: 'Now, there is no doubt that, where a set of salvors have done some acts which tend to the ultimate salvage of a vessel, they are usually entitled to some remuneration;' and he then proceeds to consider the facts which he considered showed that the alleged salvors had improperly abandoned the ship in danger. In the case of The Nellie, 29 Law T. (N. S.) 516; 2 Mar. Law Cas. 142, Sir R. Phillimore held that where, in consequence of a bona fide mistake, towing was not resumed after the hawsers had failed, yet, as beneficial services had been rendered, the salvors were entitled to be paid. And in The Melpomene, L. R. 4 Adm. & Ecc. 129, Sir R. Phillimore says: 'There are no cases which stand in the way of my adopting as a principle this, which appears to me of considerable importance to the interests of commerce and navigation, namely, that where a vessel makes a signal of distress, and another goes out with the bona fide intention of assisting that distress, and, as far as she can, does so, and some accident occurs which prevents her services being as effectual as she intended them to be, and no blame attaches to her, she ought not to go wholly unrewarded.' In The Yan-Yean, 8 Prob. Div. 147, I was of opinion that the salvors had by negligence brought the salved vessel into as great peril as that from which they had rescued her, and therefore that no claim for salvage existed. I am of opinion

that the principle laid down by Dr. Lushington and Sir R. Phillimore in the cases I have referred to, namely, that services which have contributed to the ultimate safety of a vessel, if interrupted before completion, without default of the salvor, are entitled to some remuneration, is applicable not only to the case of a vessel saved from imminent risk of wreck, but also to a case like the present, where the vessel is brought into a position of greater comparative safety than that in which she was when she asked for assistance."

From a review of the previous holdings it is concluded that, while a request for aid by a vessel in distress should preclude her from thereafter denying her danger (The Huntsville, 12 Fed. Cas. 996 [No. 6,916]; Stone v. The Jewell, 41 Fed. 103), and might have influence upon the question of propriety of the persons undertaking the service, it cannot supply the necessity of proof that the service was beneficial.

By the foregoing discussion of the law a conclusion has been reached: (1) While a salvor should exercise the skill and care that a man of ordinary prudence and capacity in the same business would be expected to use, yet in case of necessity a person without ordinary nautical skill may undertake a rescue on the sea, not assuming a knowledge which he does not have, but using in good faith such abilities as he possesses. (2) A salvor may be found guilty of misconduct, or gross negligence tantamount thereto, which may result in forfeiture of the claim for salvage; and lack of skillful operation, with or without injurious results, may diminish the reward, while the presence of such skill may increase it. (3) Specific negligence, proximately resulting in distinguishable injury to the vessel, may be used in an action for salvage either to diminish or defeat compensation; and in an action by the owners of the property, when culpable negligence is established against the salvor, resulting in injury, damages therefor may be recovered against him. (4) Compensation may not be given, unless a benefit is conferred by the saving of property; but any person whose aid has tended to this result may be compensated, although he was compelled by prudence or necessity to discontinue his assistance and leave the final rescue to others. (5) A request for aid by a vessel in distress does not authorize compensation therefor, unless the aid rendered is helpful in the final saving of property.

These views lead to the conclusion that the libel in the action of White and others against the tugboat Henry Steers, Jr., and scow No. 46 should be dismissed, with costs, and that the cross libel be also dismissed, with costs.